Michael A. Sirignano (MS 5263)
Barry I. Levy (BL 2190)
Ryan Goldberg (RG 7570)
Tamika N. Hardy (TH 0569)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs, Government Employees Insurance Co.,*
*GEICO Indemnity Co., GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO
CASUALTY CO.,

Docket No.:_____ (       )

Plaintiffs,

-against-

**Plaintiff Demands a
Trial by Jury**

NELLYA RAZZAKOVA, L.Ac.,
ADA KULAGINA, L.Ac.,
TATYANA KAPUSTINA, L.Ac.,
ELLINA MATSKINA, L.Ac.,
YURY TSUKANOV, L.Ac.,
KARINA KOLOMIYTSEVA, L.Ac.,
ROMAN SHIMUNOV, L.Ac.,
NATALYA KORNILOVA, L.Ac.,
OKSANA LENDEL, L.Ac.,
DIMITRY ZAPOLSKY, L.Ac.,
ILONA ABITBOL, L.Ac.,
LYUBOV KONDRANINA, L.Ac., and
IGOR SHKAPENYUK, L.Ac.

(the "Nominal Owner Defendants")

-and-

OKSLEN ACUPUNCTURE, PC,
BAY NEEDLE ACUPUNCTURE, PC,
PERFECT POINT ACUPUNCTURE, PC,
KARINA K ACUPUNCTURE, PC,

HEALTHY WAY ACUPUNCTURE, PC,
VS CARE ACUPUNCTURE, PC,
ALPHA ACUPUNCTURE, PC,
LOTUS ACUPUNCTURE, PC,
SUNRISE ACUPUNCTURE, PC,
EASY CARE ACUPUNCTURE, PC,
SHIROM ACUPUNCTURE, PC,
URBAN WELL ACUPUNCTURE, PC,
ACUPUNCTURE APPROACH, PC,
SML ACUPUNCTURE, PC,
BRONX ACUPUNCTURE THERAPY, PC,
TC ACUPUNCTURE, PC,
ACUHEALTH ACUPUNCTURE, PC,
NR ACUPUNCTURE, PC,
SILVER LOTUS ACUPUNCTURE, PC, and
NEW CENTURY ACUPUNCTURE, PC,

                    (the "PC Defendants")

        -and-

SYLVAN GROUP, L.L.C. A/K/A SYLVANIA GROUP
A/K/A SYLVANIA,
ANDREY ANIKEYEV, and
KARO OSIPOV,
                    (the "Management Defendants")

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively referred to hereinafter as "GEICO"

or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to terminate a massive, ongoing series of interrelated fraudulent

schemes perpetrated against GEICO and the New York automobile insurance industry by

acupuncturists, acupuncture professional corporations, non-acupuncturist laypeople who secretly

and unlawfully own and control the acupuncture professional corporations, and a lay entity that

the non-acupuncturist laypeople use to facilitate their secret and unlawful ownership and control

over the acupuncture professional corporations.  Essentially, the schemes work as follows:

> (i)     the professional corporations serve as vehicles through which fraudulent no-fault claims for reimbursement are submitted to GEICO for acupuncture services allegedly provided to individuals involved in New York automobile accidents ("Insureds");

> (ii)    though the professional corporations are nominally owned on paper by an acupuncturist, they actually are secretly and unlawfully owned and controlled by the laypeople;

> (iii)   the laypeople conceal their secret and unlawful ownership and control over the professional corporations by causing the professional corporations to enter into phony "billing" arrangements with themselves and the entity that they control;

> (iv)    the laypeople use the professional corporations to fraudulently bill GEICO by exaggerating and inflating the charges, billing for acupuncture services which are performed pursuant to a fraudulently pre-determined protocol without regard to the actual medical necessity of the treatments, and billing for services which are not rendered;

> (v)     after causing the professional corporations to submit the fraudulent billing to GEICO, the laypeople use the phony "billing" arrangements they establish with the professional corporations to unlawfully siphon all of the professional corporations' profits to themselves.

2.      Accordingly, GEICO seeks to recover more than approximately $8,519,292.00

dollars that the Defendants have stolen from GEICO.  In addition, GEICO seeks a declaration

that it is not legally obligated to pay reimbursement of more than approximately $9,882,972.00

dollars in pending fraudulent claims submitted by or through the PC Defendants because:

> (i)     the professional corporations have no right to receive payment for any pending bills submitted to GEICO because they are fraudulently incorporated, owned and/or controlled by non-acupuncturists and, therefore, are ineligible to seek or recover No-Fault Benefits;

> (ii)    the professional corporations have no right to receive payment for any pending bills submitted to GEICO because they engage in unlawful fee-splitting with non-acupuncturists;

(iii)    the professional corporations have no right to receive payment for any pending bills submitted to GEICO because the billing submitted is for acupuncture services that are performed pursuant to a fraudulently pre-determined protocol without regard to the actual medical necessity of the treatments, fraudulently exaggerates and inflates the charges, and in some cases seeks payment for services which were not rendered.

3.    The Defendants fall into the following categories:

(i)    Defendants, Okslen Acupuncture, PC ("Okslen"), Bay Needle Acupuncture, PC ("Bay Needle"), Perfect Point Acupuncture, PC ("Perfect Point"), Karina K Acupuncture, PC ("Karina K"), Healthy Way Acupuncture, PC ("Healthy Way"), VS Care Acupuncture, PC ("VS"), Alpha Acupuncture, PC ("Alpha"), Lotus Acupuncture, PC ("Lotus"), Sunrise Acupuncture, PC ("Sunrise"), Easy Care Acupuncture, PC ("Easy Care"), Shirom Acupuncture, PC ("Shirom"), Urban Well Acupuncture, PC ("Urban Well"), Acupuncture Approach, PC ("Approach"), SML Acupuncture, PC ("SML"), Bronx Acupuncture Therapy, PC ("Bronx Therapy"), TC Acupuncture, PC ("TC"), Acuhealth Acupuncture, PC ("Acuhealth"), NR Acupuncture, PC ("NR"), Silver Lotus Acupuncture, PC ("Silver Lotus"), and New Century Acupuncture, PC ("New Century") are the "PC Defendants" and are fraudulently incorporated New York acupuncture professional corporations, through which the acupuncture services purportedly were performed and billed to insurance companies, including GEICO.

(ii)    Defendants, Nellya Razzakova, L.Ac. ("Razzakova"), Ada Kulagina, L.Ac. ("Kulagina"), Tatyana Kapustina, L.Ac. ("Kapustina"), Ellina Matskina, L.Ac. ("Matskina"), Yury Tsukanov, L.Ac. ("Tsuakov"), Karina Kolomiytseva, L.Ac. ("Kolomiytseva"), Roman Shimunov, L.Ac. ("Shimunov"), Natalya Kornilova, L.Ac. ("Kornilova"), Oksana Lendel, L.Ac. ("Lendel"), Dimitry Zapolsky, L.Ac. ("Zapolsky"), Ilona Abitbol, L.Ac. ("Abitbol"), Lyubov Kondranina, L.Ac. ("Kondranina"), and Igor Shkapenyuk, L.Ac. ("Shkapenyuk") are the "Nominal Owner Defendants" and are acupuncturists licensed to practice acupuncture in the State of New York who falsely purport to own the PC Defendants.

(iii)    Defendants Sylvan Group, L.L.C. a/k/a Sylvania Group a/k/a Sylvania ("Sylvan"), Andrey Anikeyev ("Anikeyev"), and Karo Osipov ("Osipov") are the "Management Defendants" and are unlicensed, non-acupuncturists that actually own and control the PC Defendants in violation of New York law.

4.    As discussed below, Defendants at all relevant times have known that:

(i)    the PC Defendants are owned and controlled by non-acupuncturists, not the nominal owners or other licensed or certified acupuncturists;

(ii)    the PC Defendants split fees with non-acupuncturists in contravention of New York law;

(iii)    the billing codes used for the acupuncture services misrepresented and exaggerated the level of services provided in order to inflate the charges submitted to GEICO;

(iv)    the acupuncture services are performed pursuant to a fraudulently pre-determined protocol without regard to the actual medical necessity of the treatments; and

(v)    the charges for the acupuncture services are for services that, in some cases, are never performed.

5.    As such, the Defendants do not now have – and never had – any right to be compensated for the acupuncture services that were billed to GEICO through the PC Defendants. The charts attached hereto as Exhibits "5" through "24" set forth a representative sample of the fraudulent claims that the Defendants submitted, or caused to be submitted, to GEICO. The Defendants' respective interrelated schemes began as early as 2004 and have continued uninterrupted since that time. As a result of the Defendants' interrelated schemes, GEICO has incurred damages of more than $9,673,988.00 since 2004.

## THE PARTIES

### I.   Plaintiff

1.    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.   Defendants

### A.   Nominal Owner Defendants

6.      Defendant Razzakova is an acupuncturist who has been licensed to practice acupuncture in New York since October 12, 2006, and serves as the nominal or "paper" owner of NR.  Razzakova resides in and is a citizen of New York.

7.      Defendant Kulagina is an acupuncturist who has been licensed to practice acupuncture in New York since October 4, 2002, and serves as the nominal or "paper" owner of SML and Easy Care.  Kulagina resides in and is a citizen of New York.

8.      Defendant Kapustina is an acupuncturist who has been licensed to practice acupuncture in New York since September 9, 2003, and serves as the nominal or "paper" owner of Perfect Point.  Kapustina resides in and is a citizen of New York.

9.      Defendant Matskina is an acupuncturist who has been licensed to practice acupuncture in New York since December 24, 2003, and serves as the nominal or "paper" owner of Bay Needle and Healthy Way.  Matskina resides in and is a citizen of New York.

10.     Defendant Tsukanov is an acupuncturist who has been licensed to practice acupuncture in New York since August 25, 2004, and serves as the nominal or "paper" owner of Sunrise and Silver Lotus.  Tsukanov resides in and is a citizen of New York.

11.     Defendant Kolomiysteva is an acupuncturist who has been licensed to practice acupuncture in New York since January 30, 2004, and serves as the nominal or "paper" owner of Karina K and Alpha.  Kolomiytseva resides in and is a citizen of New York.

12.     Defendant Shimunov is an acupuncturist who has been licensed to practice acupuncture in New York since September 16, 2004, and serves as the nominal or "paper" owner of Bronx Therapy and Shirom.  Shimunov resides in and is a citizen of New York.

6

13.     Defendant Kornilova is an acupuncturist who has been licensed to practice acupuncture in New York since November 5, 2003, and serves as the nominal or "paper" owner of Lotus and Acuhealth. Kolomiytseva resides in and is a citizen of New York.

14.     Defendant Lendel is an acupuncturist who has been licensed to practice acupuncture in New York since August 25, 2004, and serves as the nominal or "paper" owner of VS and Okslen. Lendel resides in and is a citizen of New York.

15.     Defendant Zapolsky is an acupuncturist who has been licensed to practice acupuncture in New York since November 1, 2007, and serves as the nominal or "paper" owner of Approach. Zapolsky resides in and is a citizen of New York.

16.     Defendant Abitbol is an acupuncturist who has been licensed to practice acupuncture in New York since September 16, 2004, and serves as the nominal or "paper" owner of Urban Well. Abitbol resides in and is a citizen of New York.

17.     Defendant Kondranina is an acupuncturist who has been licensed to practice acupuncture in New York since February 5, 2008, and serves as the nominal or "paper" owner of New Century. Kondranina resides in and is a citizen of New York.

18.     Defendant Shkapenyuk is an acupuncturist who has been licensed to practice acupuncture in New York since January 30, 2004, and serves as the nominal or "paper" owner of TC. Shkapenyuk resides in and is a citizen of New York.

**B.     The PC Defendants**

19.     Defendant Okslen is a New York acupuncture professional corporation with its principal place of business in New York. Okslen was fraudulently incorporated in New York on or about November 12, 2004, is owned on paper by Lendel, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

7

20. Defendant Bay Needle is a New York acupuncture professional corporation with its principal place of business in New York. Bay Needle was fraudulently incorporated in New York on or about March 14, 2005, is owned on paper by Matskina, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

21. Defendant Perfect Point is a New York acupuncture professional corporation with its principal place of business in New York. Perfect Point was fraudulently incorporated in New York on or about September 23, 2005, is owned on paper by Kapustina, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

22. Defendant Karina K is a New York acupuncture professional corporation with its principal place of business in New York. Karina K was fraudulently incorporated in New York on or about May 19, 2006, is owned on paper by Kolomiytseva, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

23. Defendant Healthy Way is a New York acupuncture professional corporation with its principal place of business in New York. Healthy Way was fraudulently incorporated in New York on or about August 21, 2006, is owned on paper by Matskina, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

24. Defendant VS is a New York acupuncture professional corporation with its principal place of business in New York. VS was fraudulently incorporated in New York on or about October 18, 2006, is owned on paper by Lendel, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

25. Defendant Alpha is a New York acupuncture professional corporation with its principal place of business in New York. Alpha was fraudulently incorporated in New York on

or about November 22, 2006, is owned on paper by Kolomiytseva, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

26.     Defendant Lotus is a New York acupuncture professional corporation with its principal place of business in New York. Lotus was fraudulently incorporated in New York on or about January 26, 2007, is owned on paper by Kornilova, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

27.     Defendant Sunrise is a New York acupuncture professional corporation with its principal place of business in New York. Sunrise was fraudulently incorporated in New York on or about October 25, 2007, is owned on paper by Tsukanov, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

28.     Defendant Easy Care is a New York acupuncture professional corporation with its principal place of business in New York. Easy Care was fraudulently incorporated in New York on or about February 13, 2008, is owned on paper by Kulagina, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

29.     Defendant Shirom is a New York acupuncture professional corporation with its principal place of business in New York. Shirom was fraudulently incorporated in New York on or about April 15, 2008, is owned on paper by Shimunov, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

30.     Defendant Urban Well is a New York acupuncture professional corporation with its principal place of business in New York. Urban Well was fraudulently incorporated in New York on or about May 21, 2008, is owned on paper by Abitbol, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

31.     Defendant Approach is a New York acupuncture professional corporation with its principal place of business in New York. Approach was fraudulently incorporated in New York on or about December 26, 2008, is owned on paper by Zapolsky, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

32.     Defendant SML is a New York acupuncture professional corporation with its principal place of business in New York. SML was fraudulently incorporated in New York on or about May 11, 2009, is owned on paper by Kulagina but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

33.     Defendant Bronx Therapy is a New York acupuncture professional corporation with its principal place of business in New York. Bronx Therapy was fraudulently incorporated in New York on or about December 4, 2009, is owned on paper by Shimulov, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

34.     Defendant TC is a New York acupuncture professional corporation with its principal place of business in New York. TC was fraudulently incorporated in New York on or about June 24, 2010, is owned on paper by Shkapenyuk, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

35.     Defendant Acuhealth is a New York acupuncture professional corporation with its principal place of business in New York. Acuhealth was fraudulently incorporated in New York on or about June 24, 2010, is owned on paper by Kornilova, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

36.     Defendant NR is a New York acupuncture professional corporation with its principal place of business in New York. NR was fraudulently incorporated in New York on or

about October 4, 2010, is owned on paper by Razzakova, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

37.     Defendant Silver Lotus is a New York acupuncture professional corporation with its principal place of business in New York. Silver Lotus was fraudulently incorporated in New York on or about December 2, 2010, is owned on paper by Tsukanov, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

38.     Defendant New Century is a New York acupuncture professional corporation with its principal place of business in New York. New Century was fraudulently incorporated in New York on or about December 9, 2010, is owned on paper by Kondranina, but in actuality is owned and controlled by unlicensed, uncertified non-acupuncturists in contravention of New York law.

**C.     The Management Defendants**

39.     Defendant Anikeyev resides in and is a citizen of the State of New Jersey. Anikeyev never has been a licensed or certified acupuncturist, yet has secretly owned, controlled, and derived economic benefit from the Defendant PCs, using Sylvan, in contravention of New York law.

40.     Defendant Osipov resides in and is a citizen of the State of New Jersey. Osipov never has been a licensed or certified acupuncturist, yet has secretly owned, controlled, and derived economic benefit from the Defendant PCs, using Sylvan, in contravention of New York law.

41.     Defendant Sylvan is a New Jersey limited liability company with its principal place of business in New York. Sylvan was organized on or about July 17, 2002, is owned and controlled by Osipov and Anikeyev, and has been used by Osipov and Anikeyev to illegally own

and control the PC Defendants and to siphon insurance profits generated by the PC Defendants to non-acupuncturists.

## JURISDICTION AND VENUE

42. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

43. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.    An Overview of the No-Fault Laws and Licensing Statutes

44. GEICO underwrites automobile insurance in the State of New York.

45. New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

46. No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including acupuncture services.

47. An Insured can assign his/her right to No-Fault Benefits to health care service providers in exchange for those services. Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

48. Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they were unlawfully incorporated. In New York, only a licensed or certified acupuncturist may: (i) practice acupuncture; (ii) own and control a professional service corporation authorized to operate an acupuncture practice; (iii) employ and supervise other acupuncturists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from acupuncturist services. Unlicensed individuals may not: (i) practice acupuncture; (ii) own or control a professional service corporation authorized to operate an acupuncture practice; (iii) employ or supervise acupuncturists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from acupuncturist services.

49. Pursuant to the No-Fault Laws, acupuncture providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting with unlicensed, uncertified individuals or entities, which is prohibited by, inter alia, New York's Education Law.

50.     The implementing regulation adopted by the Superintendent of Insurance, 11

N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section
> 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New
> York State or local licensing requirement necessary to perform such service in
> New York ... .

51.     Pursuant to New York State Insurance Law § 403, the NF-3s submitted by a

health care provider to GEICO, and to all other automobile insurers, must be verified by the

health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or
> other person files an application for insurance or statement of claim containing
> any materially false information, or conceals for the purpose of misleading,
> information concerning any fact material thereto, commits a fraudulent insurance
> act, which is a crime.

## II.     An Overview of the Fraudulent Incorporation and Operation of the PC Defendants

52.     As set forth in more detail below, beginning in 2004, and continuing through the

present day, the Defendants masterminded and implemented a series of fraudulent schemes in

which the PC Defendants – twenty acupuncture professional service corporations nominally

owned on paper by the Nominal Owner Defendants, but actually illegally owned and controlled

by non-acupuncturists – have been used to bill the New York automobile insurance industry

millions of dollars that they never were eligible to receive.

53.     Despite purporting to be twenty separate and independently owned acupuncture

professional corporations, none of the PC Defendants maintain stand-alone practices; none

identify the name of the purported acupuncturist-owner on their letterhead; none have internet

websites or appear to advertise for patients; none make their location readily known to the

general public, and none bill legitimately for acupuncture treatment that reflects the exercise of

independent acupuncture judgment.

14

54. Instead, all twenty of the PC Defendants are illegally owned and controlled by the Management Defendants, who operate (or previously operated) the professional corporations through a network of clinics located throughout the New York City area (the "Clinics") where each Insured is subjected to a cookie-cutter pattern of predetermined treatment, purportedly justified based on boilerplate and virtually identical initial examination reports. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality are organized to supply convenient, one-stop shops for No-Fault insurance fraud.

55. As set forth in detail below, the Management Defendants recruited various licensed acupuncturists who essentially "sold" their acupuncture licenses to them so that they could fraudulently incorporate the professional corporations and use them to submit large-scale fraudulent billing to insurers. The Nominal Owner of each PC Defendant in actuality is nothing more than a glorified employee. True ownership and control of each PC Defendant has rested at all times entirely with the Management Defendants, who have use the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely: (i) employing acupuncturists; (ii) controlling their practices; and (iii) charging for and deriving an economic benefit from their services.

56. To conceal their true ownership and control of each PC Defendant, while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have each of the Nominal Owner Defendants and PC Defendants enter into a purported "billing" arrangement. The billing arrangement is a sham, and is instead used as a tool to permit the Management Defendants (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own each PC Defendant; and (ii) to

15

siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through each PC Defendant.

57.    In addition to controlling the operations, finances, and management of the PC Defendants, the Management Defendants supervise and control the treatment and billing protocols for each of the PC Defendants.

58.    For example, despite purporting to be twenty separate and independently owned acupuncture professional corporations, all twenty of the PC Defendants utilize boilerplate and virtually identical initial examination reports that:

(i)    contain the *exact same wording* in the "Treatments and Recommendations" section for virtually every Insured;

(ii)    contain the *exact same wording* in the "Comments" section for virtually every Insured;

(iii)    contain the *exact same wording* in the "Prognosis" section for virtually every Insured;

(iv)    conclude for virtually every Insured that the Insured "remains impaired" with a "guarded" prognosis no matter the actual nature of each Insured's condition;

(v)    state that virtually every Insured "has been persistent with acupuncture and showed moderate improvement" no matter the actual level of improvement of each Insured; and

(vi)    state that the exact same acupuncture needle is used with the *exact same phrase* "We utilize only the best disposable needles available: MAC," with the *exact same description* of the needle packaging.

A representative sample of initial reports is annexed hereto as Exhibit "1."

59.    As a further example, despite purporting to be twenty separate and independently owned acupuncture professional corporations, the PC Defendants regularly bill GEICO for three to four units of treatment, purportedly consisting of up to 60 minutes of personal one-on-one contact per Insured, per day, at continuously steady high frequencies per week, using a limited

16

number of needles inserted into a small range of common and repetitive acupuncture points, even though they know full well that:

    (i)    the Insureds almost never actually receive the billed amount of treatment units, consisting of up to 60 minutes of treatment per day;

    (ii)    the Insureds almost never actually receive personal one-on-one contact or, if they do, the contact is never of sufficient duration to cross the threshold of exceeding the first unit of billing;

    (iii)    virtually all treatments rendered are face down, with all points billed for accessible for needling at one time, during one unit of treatment;

    (iv)    legitimate acupuncture requires adjustments in treatment as treatment progresses over time (but no such adjustments are made for the Insureds); and

    (v)    legitimate acupuncture treatment should be individualized to each Insured (but no such individualization is provided to the Insureds).

60.    The boilerplate and virtually identical initial examination reports, the inflated billings, and the repetitive and predetermined treatments are all part of a pre-determined protocol imposed by the Management Defendants to maximize the profits that they illegally siphon off from the PC Defendants, without regard to the actual medical necessity of the treatments allegedly provided.

61.    The Nominal Owner Defendants, as well as the acupuncturists working for the PC Defendants, have little or no knowledge of, or control over, the operations, finances, billings or collections of the PC Defendants. In fact, the Nominal Owner Defendants, as well as the acupuncturists working for the PC Defendants, know that the Management Defendants are truly in control of the professional corporations and the profits generated by the professional corporations -- and they consider Anikeyev and/or Osipov to be their "boss" and/or "supervisor."

62.    The Management Defendants, knowing full well that their scheme is illegal, do their best to conceal their identities and prevent any New York insurer from obtaining

information regarding themselves or the PC Defendants. In fact, although the bills for each of the twenty PC Defendants originates from Sylvan, and GEICO has been directed time and again to Sylvan whenever GEICO has raised questions about the PC Defendants' operations, ownership, and/or billing, Sylvan's office in Brooklyn has a sign taped to the door that reads "No admittance or we will call the police and have you arrested." Moreover, although various Nominal Owner Defendants and treating acupuncturists have referred GEICO to call the telephone number 718-676-7077 for information concerning the PC Defendants (which number is associated with Sylvan), Sylvan personnel refuse to disclose the name of the company they work for and deny knowledge of the PC Defendants, all in a systematic attempt to conceal their fraud.

63.     The Management Defendants are no strangers to this type of fraudulent scheme. Anikeyev was sued by State Farm in 2010, alleging that Anikeyev, a non-physician, illegally controlled, managed and operated numerous other acupuncture professional corporations, in contravention of New York law. A copy of the Complaint in State Farm v. Anikeyev, et. al., Index No.: 4399/10 (Supreme Ct. Nassau Cty. 2010) is annexed hereto as Exhibit "2." In fact, some of the professional corporations at issue in the State Farm litigation were previously determined to be fraudulently incorporated and ineligible to seek reimbursement for their alleged acupuncture services during the course of AAA No-Fault arbitration proceedings.

**III.     The Defendants' Fraudulent Treatment and Billing Protocol**

64.     In furtherance of the Defendants' fraudulent scheme, every Insured who is referred to one of the PC Defendants is subjected to acupuncture treatments that are provided – to the extent that they are provided at all – pursuant to a pre-determined, fraudulent protocol, without regard to the actual medical necessity of the treatments. Then, the Defendants submit

18

billing, or caused it to be submitted to GEICO, which likewise follows a pre-determined, fraudulent protocol. Specifically:

**A.    The Phony Acupuncture "Treatments" Provided Through the PC Defendants**

65.    Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Chi"), or more particularly unique patterns of underlying strengths and weaknesses in the flow of Chi that are impacted differently from trauma. When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

66.    The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity. Since every individual has unique Chi, acupuncture treatment should be individualized. In fact, the differences in each individual's unique patterns of underlying strengths and weaknesses in the flow of Chi should be reflected in different treatment strategies.

67.    Moreover, any legitimate acupuncture treatment requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Therefore, adjustments in treatment should be made as treatment progresses over time in order to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health.

68.    Any legitimate acupuncture treatment also requires meaningful, genuine, and individualized documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's progress throughout the course of treatment.

69. The purported "acupuncture" services provided by the PC Defendants do not remotely comport with any of the aforesaid basic, legitimate acupuncture requirements. All patients are treated with virtually identical point prescriptions, without regard to any necessary individual treatment strategies, without regard to any necessary adjustments in treatment as treatment progresses over time, and without meaningful, genuine, and individualized documentation. At best, the purported "acupuncture" services provided by the PC Defendants consist of inserting needles into Insureds in an assembly-line fashion that bears little, if any, relation to the Insured's condition and are not designed to effectively treat or otherwise benefit the Insureds. As such, these acupuncture services are not medically necessary.

70. The services billed for by the PC Defendants also reflect a lack of independent professional acupuncture judgment and instead reflect a predetermined protocol designed to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

71. For instance:

(i) individualized initial examinations are not performed and/or not documented;

(ii) there is no evidence of any genuine interval assessment of the patients' condition and prognosis as treatment continues;

(iii) needles are inserted into a small range of common and repetitive acupuncture points and appear to have been pre-determined solely for the sake of expediency rather than treatment of the alleged injury;

(iv) the number of needles used is often insufficient;

(v) the number and location of acupuncture points used is insufficient to justify the number of units billed;

(vi) patients are universally getting a very high frequency of treatment (sessions 3-4 per week, for months) that are not supported by the alleged injuries and are not adjusted to reflect the Insureds' improvement or lack thereof;

20

(vii)    in many cases, injuries noted in the initial acupuncture examination reports never are addressed or treated in any manner; and

(viii)   the treatments rendered are cookie-cutter and are not intended to actually address all of the Insureds' injuries.

72.    The Defendants' cookie-cutter approach to the acupuncture treatments that they perform, or cause to be performed, on virtually every Insured is designed solely to maximize the charges that they can submit through the PC Defendants to GEICO and other insurers, and to maximize their ill-gotten profits.

**B.**    **The Fraudulent Billing Through the PC Defendants**

73.    Not only do the Defendants submit billing, or cause it to be submitted, for cookie-cutter acupuncture treatments that are provided without regard to actual medical necessity, they also misrepresent the nature and extent of the treatments that actually are provided in the billing that they submit, or cause to be submitted, to GEICO. These misrepresentations, spanning over the twenty PC Defendants that purport to be separately owned, are plainly part of the pre-determined, fraudulent billing protocol imposed by the Management Defendants.

74.    Universally across all twenty PC Defendants, the Defendants routinely inflate the charges to GEICO by billing for three to four units of treatment (or sometimes more), purportedly consisting of 45 minutes to 60 minutes of personal, one on one contact, per Insured per day, along with bogus charges for "adjunct" acupuncture procedures.    A representative sample of bills is annexed hereto as Exhibit "3."

75.    The purported acupuncture treatment described in the treating acupuncturist's notes in almost all cases fails to justify the billing submitted by the PC Defendants for multiple units of personal, one-on-one contact, lasting up to 60 minutes.  In fact, virtually all treatments rendered are face down, with all points billed for by the PC Defendants accessible for needling at

one time, during one unit of treatment. In addition, GEICO obtained statements and reports from Insureds who advised that acupuncture treatment at the PC Defendants typically lasted under 15 minutes, and generally no longer than 30 minutes, and was often rendered concurrently with other treatments such as physical therapy.

76.    Examples of patient statements obtained by GEICO are as follows:

(i)     VS purportedly provided acupuncture treatment to an Insured under claim no.: 0092708860101044.   The claimant advised GEICO that the acupuncture "treatments" lasted less than 15 minutes and there was no reinsertion of needles. In addition the acupuncturist "Igor" would set a timer and leave the room after he inserted the needles.   The patient only received 3-4 needles at a time. The claimant also advised that he was receiving physical therapy concurrently with the acupuncture treatment.

(ii)    VS purportedly provided acupuncture treatment to an Insured under claim no.: 0344725660101020.   The claimant advised GEICO that the acupuncture "treatments" lasted 10-15 minutes and there was no reinsertion of needles.   The claimant also advised that she was receiving physical therapy concurrently with the acupuncture treatment

(iii)   Healthy Way purportedly provided acupuncture treatment to an Insured under claim no.: 0230399850101047.   The claimant advised GEICO that the acupuncture "treatments" lasted 10-15 minutes and there was no reinsertion of needles and they did not receive a comprehensive examination prior to starting treatment. The claimant also advised that she was receiving physical therapy concurrently with the acupuncture treatment.

(iv)    Healthy Way purportedly provided acupuncture treatment to an Insured under claim no.: 0237229790101042.   The claimant advised GEICO that the acupuncture "treatments" lasted for 10-15 minutes and there was no reinsertion of needles and he did not receive a comprehensive examination prior to starting treatment. The claimant also advised that he was receiving physical therapy concurrently with the acupuncture treatment.

(v)     Easy Care purportedly provided acupuncture treatment to an Insured under claim no.: 0391905890101014.   The claimant advised GEICO that the acupuncture "treatments" lasted 15 minutes and there was no reinsertion of needles.

(vi)    Easy Care purportedly provided acupuncture treatment to an Insured under claim no.: 0357423660101018.   The claimant advised GEICO that the acupuncture "treatments" lasted 15 minutes.

(vii)     Acuhealth purportedly provided acupuncture treatment to an Insured under claim no.: 0324781920101023.  The claimant advised GEICO that the acupuncture "treatments" lasted approximately 15 minutes and there was no reinsertion of needles.   Additionally, the claimant denied receiving a comprehensive examination.  The billing received by GEICO for this patient routinely reflected up to 60 minutes of treatment being rendered as well as the performance of a comprehensive examination.

(viii)    Alpha purportedly provided acupuncture treatment to an Insured under claim no.: 0340850420101013.    The claimant advised GEICO that the acupuncture "treatments" lasted approximately 15 minutes and there was no reinsertion of needles. Additionally, the claimant denied received a comprehensive examination prior to treatment.  The billing received by GEICO for this patient routinely reflected 60 minutes of treatment being rendered as well as the performance of a comprehensive examination.

(ix)      Perfect Point purportedly provided acupuncture treatment to an Insured under claim no.: 0313754210101014.     The claimant advised GEICO that the acupuncture "treatments" lasted approximately 15 minutes and there was no reinsertion of needles.    The claimant stated the treatment did not consist of electric stimulation. Additionally, the claimant denied receiving a comprehensive examination. The billing received by GEICO for this patient routinely reflected at least 45 minutes of treatment (with electric stimulation) being rendered as well as the performance of a comprehensive examination.

(x)       Shirom purportedly provided acupuncture treatment to an Insured under claim no.: 0231765330101048.   The claimant advised GEICO that the acupuncture "treatments" lasted approximately 15 minutes and there was no reinsertion of needles.    Additionally, the claimant stated that they were receiving the acupuncture treatment concurrently with physical therapy treatments. The billing received by GEICO for this patient routinely reflected at least 45 minutes of treatment being rendered.

(xi)      Shirom purportedly provided acupuncture treatment to an Insured under claim no.: 0302717080101037.  The claimant advised GEICO that the acupuncture "treatments" lasted approximately 15 minutes and there was no reinsertion of needles. Additionally, the claimant stated that she was receiving the acupuncture treatment concurrently with physical therapy treatments.  The billing received by GEICO for this patient routinely reflected at least 45 minutes of treatment being rendered.

(xii)     Bay Needle purportedly provided acupuncture treatment to an Insured under claim no.:  0411130990101014.     The claimant advised GEICO that the acupuncture "treatments" lasted approximately 15-20 minutes and there was no reinsertion of needles. Additionally, the claimant stated that they were receiving the acupuncture treatment concurrently with physical therapy treatments.  The

billing received by GEICO for this patient routinely reflected at least 45 minutes of treatment being rendered.

(xiii)   Bronx Health purportedly provided acupuncture treatment to an Insured under claim no.: 0087448400101207. The claimant advised GEICO that they were receiving the acupuncture treatment concurrently with physical therapy treatments. Additionally, the claimant advised that they did not have a comprehensive examination. The claimant also advised that she never received Moxibustion treatment. The billing received by GEICO for this patient routinely reflected a charge for the use of Moxibustion. GEICO was also billed for a comprehensive examination.

(xiv)   Okslen purportedly provided acupuncture treatment to an Insured under claim no.: 0291904500101028. The claimant advised GEICO that the acupuncture "treatments" lasted approximately 15 minutes and there was no reinsertion of needles.

(xv)   Okslen purportedly provided acupuncture treatment to an Insured under claim no.: 0299033100101014. The claimant advised GEICO that the acupuncture "treatments" lasted approximately 15 minutes and there was no reinsertion of needles. The billing received by GEICO for this patient routinely reflected at least 30 minutes of treatment being rendered.

77.   Defendants' fraudulent billing scheme misrepresents and exaggerates the level of services provided in order to inflate the charges submitted to GEICO. Specifically, the PC Defendants uniformly submit billing to GEICO for multiple segments of purported one-on-one contact rendered on the same day for each Insured, under both billing code 97810 and 97811, notwithstanding the fact that the "treatments" allegedly rendered by the PC Defendants generally last 15 minutes or less, and were (or could have been) rendered in one treatment segment. [1]

78.   According to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, billing code 97810 is used to charge for an Insured's initial 15 minutes of personal, one-on-one contact with an acupuncturist

---

[1] The only deviation appears to be when certain PC Defendants bill under codes 97813 and 97814. The only difference between these codes and 97810/97811 is the use of electric stimulation. Regardless of the codes used, the PC Defendants, almost universally will bill GEICO for treatments purportedly lasting 45 to 60 minutes, per patient, per day.

on any given day where – as is the practice at the PC Defendants – the acupuncture services are performed without electrical stimulation.

79. Pursuant to the Fee Schedule, only <u>one charge</u> under billing code 97810 can be submitted for a single patient on a single day, regardless of the number of needles that are inserted into the patient or the number of body parts into which the needles are inserted. As the American Medical Association ("AMA") has noted:

> [O]nly one initial acupuncture code [i.e., billing code 97810] is reported per date of service as these services include both the treatment, set-up, and evaluation necessary to identify the specific acupuncture service(s) necessary for the patient. Therefore, when reporting this service, only one initial code is reported per date of service to identify the complete initial service provided.
>
> For each additional increment of "personal one-on-one contact with the patient" performed, … [billing code] 97811 … is reported … .

Relevant portions of the AMA's "Coding Communication: Update on Reporting Acupuncture Procedures" are annexed hereto as Exhibit "4."

80. Despite the prohibition on billing more than one 97810 code per day, virtually all of the PC Defendants have submitted acupuncture bills with multiple charges for initial "treatments" allegedly provided to a single Insured on a single day, fraudulently misrepresenting that two or more separate initial acupuncture treatments were actually provided to Insureds on a single day.

81. In addition, the PC Defendants also bill for additional acupuncture treatment for virtually every single Insured each day under billing code 97811. According to the Fee Schedule, billing code 97811 only can be used if: (i) a patient spends an initial 15 minutes of personal, one-on-one contact with the acupuncturist (which is billed under billing code 97810); (ii) the acupuncturist then removes the needles from the patient's body; (iii) the acupuncturist

spends <u>additional</u> personal, one-on-one contact of up to 15 minutes with the patient; during which time (iv) the acupuncturist "re-inserts" needles into the same part of the patient's body.

82.     The PC Defendants never fully render even the initial 15 minutes of treatment to justify the billing because the clock must stop when one on one contact stops. In addition, there is no way that the treatments allegedly rendered by the PC Defendants justify a second segment under 97811, which requires that the acupuncturist spend up to an <u>additional</u> 15 minutes of personal, one-on-one contact with the Insureds over and above the <u>initial</u> 15 minutes of personal, one-on-one contact that are billed under billing code 97810. Though the PC Defendants submit multiple charges under billing code 97811 in virtually every bill for virtually every single Insured, the acupuncturists associated with the PC Defendants almost never spend an <u>additional</u> unit of personal, one-on-one contact with the Insureds over and above the initial 15 minutes billed under billing code 97810.

83.     Moreover, billing code 97811 requires that the acupuncturists take additional time to either manipulate the existing needles or insert new needles in different locations so as to amount to an additional treatment on the same day (not the same treatment.). Notwithstanding the PC Defendants' charges under billing code 97811, the acupuncturists associated with the PC Defendants almost never used additional needles or manipulated the needles such that they were performing an additional treatment of one-on-one contact with the patient, as is required by the code.

84.     The PC Defendants fraudulently inflate the charges to GEICO further by routinely billing for 45 to 60 minutes of treatment per Insured per day. The billing submitted to GEICO for these treatment sessions regularly includes one or more charges under 97810 (15 minutes of time) and two or three charges under 98711 (each an additional 15 minutes of time), for

"reinsertion." As mentioned above, Insureds routinely advise GEICO that treatment lasts no more than fifteen minutes. These charges are universally fraudulent as virtually no patient actually received 45 or 60 minutes of treatment. The Defendants are enriching themselves by improperly billing GEICO for multiple segments of initial treatment and then additional segments of treatment on top of the inflated initial charges. For example, assuming an acupuncturist spent fifteen (15) minutes of personal, one-on-one time with the patient, the PC Defendants would be entitled to submit a bill which contained:

| Billing Code | Service | Charge |
|---|---|---|
| 97810 | Acupuncture [initial 15 minutes of personal one-on-one contact with the patient] | $30.00 |
| | TOTAL: | $30.00 |

85.     Because the Defendants fraudulently unbundle their charges under billing code 97810 into multiple charges of 97810 on a single day, and then use these multiple 97810 charges as the "basis" for multiple charges of 97811 on a single day, the Defendants typically submit bills that include, as set forth below, triple or quadruple the proper charges:

| Billing Code | Service | Charge |
|---|---|---|
| 97810 | Acupuncture [initial 15 min] | $55. |
| 97811 | Acupuncture [each additional 15 min] | $40 |
| 97810 | Acupuncture [initial 15 min] | $55 |
| 97811 | Acupuncture [each additional 15 min] | $40 |
| | TOTAL: | $190 |

86.     The inflated charges billed as described above are over and above the other charges regularly submitted by the Defendant PCs to GEICO for initial and follow up evaluations, and charges for adjunct modalities, like moxibustion and infra red therapy.

27

87.     For example, many of the PC Defendants' bills regularly include charges for purported infra-red therapy and/or moxibustion, to further inflate the charges billed for every Insured on every day, as follows:

| Billing Code | Service | Charge |
|---|---|---|
| 97810 | Acupuncture  [initial 15 min] | $55. |
| 97811 | Acupuncture [each additional 15 min] | $40 |
| 97810 | Acupuncture  [initial 15 min] | $55 |
| 97811 | Acupuncture [each additional 15 min] | $40 |
| 97039 | Moxibustion | $35 |
|  | **TOTAL:** | **$225** |

88.     Similar to the acupuncture treatments themselves, the PC Defendants' billing for moxibustion is not supported by the acupuncturist's notes in almost all cases. Legitimate use of moxibustion requires that the acupuncturist be with the patient while a burning substance is applied either on the head of the needle or around a specific acupoint. Moxabustion therapy is attended therapy.

89.     In virtually all cases where the PC Defendants bill for moxibustion, the PC Defendants do not provide legitimate moxibustion treatment that justifies billing for a separate procedure. Instead, the PC Defendants use "spray–on" liquid in connection with the needle acupuncture, which does not amount to a separately billable service.

90.     Finally, in some cases the PC Defendants seeks payment for services which were not rendered at all. Indeed, the sheer volume of purported acupuncture treatments, and patients allegedly receiving treatment, billed by each of the PC Defendants to GEICO alone is in many cases physically impossible during the number of hours in a single work day. Considering that the billing received is for treatment billed to GEICO alone, and that there are many other New York automobile insurers that make up a majority of the No-Fault insurance coverage market,

28

the total number of patients allegedly being treated by the PC Defendants on many days demonstrates that the PC Defendants seek payment for services which were, in many instances, not actually rendered.

91.  Through their fraudulent billing practices, the Defendants increase by a huge order of magnitude the charges that they submit, or cause to be submitted, to GEICO and other insurers. Representative examples of the Defendants' fraudulent bills are annexed hereto as Exhibit "3." See also Exhibits "5" through "24."

## IV.  The Fraudulent Incorporation of Each of the Individual PC Defendants

### A.  The Fraudulent Incorporation and Operation of Okslen

92.  Defendants' series of schemes involving the PC Defendants at issue in this litigation commenced in or about 2004, when the Management Defendants recruited a licensed acupuncturist – Lendel – who was willing to essentially "sell" his acupuncture license to them so that they could fraudulently incorporate Okslen and use it to submit large-scale fraudulent billing to insurers.

93.  In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Okslen to operate an acupuncture practice, the Management Defendants entered into a secret scheme with Lendel. In exchange for a designated salary or other form of compensation, in November 2004, Lendel agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of Okslen and that he truly owns, controls and practices through the professional corporation.

94.     Once Okslen was fraudulently incorporated on or about November 12, 2004, Lendel ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

95.     Lendel never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

96.     Throughout the course of Lendel's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Okslen has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Okslen are dispersed by the professional corporation.

97.     In reality, Lendel never has been anything more than a de facto employee of the Management Defendants and Okslen. Lendel does not practice acupuncture or provide any services through the professional corporation.

98.     To conceal their true ownership and control of Okslen while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Lendel and Okslen enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Okslen.

99.     While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Okslen; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Okslen.

100.     In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Okslen. For example, it was standard protocol for Okslen to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

101.     Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, continued uninterrupted throughout the entire scheme, are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Okslen, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Okslen, contained the same typographical errors in the "Comments" and "Prognosis" sections. For example, Okslen's initial reports contained in the "Prognosis" section: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Additionally, virtually all reports are prepared on a form which only lists the name of the professional corporation and no other information. Moreover, many of

the reports under the Okslen name are blatantly fraudulent, as the same signature page (referencing a certain patient) was repeatedly appended to purported reports for other alleged patients.

**B.** **The Fraudulent Incorporation and Operation of Bay Needle**

102.  In or about 2005, the Management Defendants recruited another licensed acupuncturist – Matskina – who was willing to essentially "sell" her acupuncture license to them so that they could fraudulently incorporate Bay Needle and use it to submit large-scale fraudulent billing to insurers.

103.  In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Bay Needle to operate an acupuncture practice, the Management Defendants entered into a secret scheme with Matskina. In exchange for a designated salary or other form of compensation, in March 2005, Matskina agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she is the true shareholder, director and officer of Bay Needle and that she truly owns, controls and practices through the professional corporation.

104.  Once Bay Needle was fraudulently incorporated on or about March 14, 2005, Matskina ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

105.  Matskina never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing

32

directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

106.   Throughout the course of Matskina's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Bay Needle has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Bay Needle are dispersed by the professional corporation.

107.   In reality, Matksina never has been anything more than a de facto employee of the Management Defendants and Bay Needle. Matskina does not practice acupuncture or provide any services through the professional corporation.

108.   To conceal their true ownership and control of Bay Needle while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Matskina and Bay Needle enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Bay Needle.

109.   While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Bay Needle; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Bay Needle. In fact, the professional corporation advises that all questions about its operations should be made to a number (718-676-7077) that directs GEICO to Sylvan.

110.    In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Bay Needle.  For example, it was standard protocol for Bay Needle to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

111.    Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports.  These reports, which started with Okslen and continued uninterrupted throughout the entire scheme, are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis.  Virtually every report submitted to GEICO by the PC Defendants, including those by Bay Needle, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section and the "Prognosis" section.  The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Bay Needle, contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added).  While the "Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added).  Additionally, virtually all reports are prepared on a form which only lists the name of the professional corporation and no other information.

C.    **The Fraudulent Incorporation and Operation of Perfect Point**

112.    The series of schemes continued with the incorporation of Perfect Point, in or about 2005, when the Management Defendants recruited a licensed acupuncturist – Kapustina –

34

who was willing to essentially "sell" her acupuncture license to them so that they could fraudulently incorporate Perfect Point and use it to submit large-scale fraudulent billing to insurers.

113.   In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Perfect Point to operate an acupuncture practice, the Management Defendants entered into a secret scheme with Kapustina. In exchange for a designated salary or other form of compensation, in September 2005, Kapustina agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she is the true shareholder, director and officer of Perfect Point and that she truly owns, controls and practices through the professional corporation.

114.   Once Perfect Point was fraudulently incorporated on or about September 23, 2005, Kapustina ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

115.   Kapustina never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation.  True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

116.   Throughout the course of Kapustina's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Perfect Point has been vested entirely with the Management Defendants.  This includes control over the

treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Perfect Point are dispersed by the professional corporation.

117.  In reality, Kapustina never has been anything more than a de facto employee of the Management Defendants and Perfect Point, as she merely occasionally provided acupuncture treatments through the professional corporation.

118.  To conceal their true ownership and control of Perfect Point while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Kapustina and Perfect Point enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Perfect Point.

119.  While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Perfect Point; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Perfect Point.  In fact, the professional corporation's mailing address is associated with the number (718-676-7077) that directs GEICO to Sylvan.

120.  In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Perfect Point.  For example, it was standard protocol for Perfect Point to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

121.    Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Perfect Point, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Perfect Point contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added). While the "Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Additionally, virtually all reports, including Perfect Point's reports, are prepared on a form which only lists the name of the professional corporation and no other information.

**D.      The Fraudulent Incorporation and Operation of Karina K**

122.    The series of schemes continued with the incorporation of Karina K, in or about 2006, when the Management Defendants recruited a licensed acupuncturist – Kolomiytseva – who essentially was willing to essentially "sell" her acupuncture license to them so that they could fraudulently incorporate Karina K and use it to submit large-scale fraudulent billing to insurers.

123.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Karina K to operate an acupuncture

practice, the Management Defendants entered into a secret scheme with Kolomiytseva. In exchange for a designated salary or other form of compensation, in May 2006, Kolomiytseva agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she is the true shareholder, director and officer of Karina K and that she truly owns, controls and practices through the professional corporation.

124. Once Karina K was fraudulently incorporated on or about May 19, 2006, Kolomiytseva ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

125. Kolomiytseva never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

126. Throughout the course of Kolomiytseva's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Karina K has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Karina K are dispersed by the professional corporation.

127.    In reality, Kolomiytseva never has been anything more than a de facto employee of the Management Defendants and Karina K, as she merely occasionally provided acupuncture treatments through the professional corporation.

128.    To conceal their true ownership and control of Karina K while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Kolomiytseva and Karina K enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Karina K.

129.    While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Karina K; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Karina K. In fact, the professional corporation's mailing address is associated with the number (718-676-7077) that directs GEICO to Sylvan.

130.    In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Karina K. For example, it was standard protocol for Karina K to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

131.    Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or

diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by

Karina K, contain the exact same language in the "Treatments and Recommendations" section,

the "Comments" section, and the "Prognosis" section. The Management Defendants were so

brazen in their scheme that virtually every report, submitted by the twenty professional

corporations, including Karina K, contained the same typographical errors in the "Comments"

and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is

a direct casual relationship between the accident described and current injuries." (emphasis

added). While the "Prognosis" section states: "The prognosis of the patient's consultation in

regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis

added). Additionally, virtually all reports, including Karina K, are prepared on a form which

only lists the name of the professional corporation and no other information.

### E.     The Fraudulent Incorporation and Operation of Healthy Way

132.     The series of schemes continued with the incorporation of Healthy Way, in or

about 2006, when the Management Defendants convinced Matskina to again essentially "sell"

her acupuncture license to them so that they could fraudulently incorporate Health Way and use

it to submit large-scale fraudulent billing to insurers.

133.     In order to circumvent New York law and to induce the State Education

Department to issue a certificate of authority authorizing Healthy Way to operate an acupuncture

practice, the Management Defendants again entered into a similar secret scheme with Matskina.

In exchange for a designated salary or other form of compensation, in August 2006, Matskina

agreed to falsely represent in the certificate of incorporation filed with the Department of

Education, and the biennial statements filed thereafter, that she is the true shareholder, director

and officer of Healthy Way and that she truly owns, controls and practices through the professional corporation.

134.    Once Healthy Way was fraudulently incorporated on or about August 21, 2006, Matskina ceded true beneficial ownership and control over the professional corporation to the Management Defendants, like she had with Bay Needle.

135.    Matskina never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

136.    Throughout the course of Matskina's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Healthy Way has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Healthy Way are dispersed by the professional corporation.

137.    In reality, Matskina never has been anything more than a de facto employee of the Management Defendants and Healthy Way, and she never provided services through the professional corporation.

138.    To conceal their true ownership and control of Healthy Way while simultaneously effectuating pervasive, total control over its operation and management, the Management

41

Defendants arranged to have Matskina and Healthy Way enter into a "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Healthy Way.

139.    While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Healthy Way; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Healthy Way. In fact, employees of Healthy Way advised GEICO to contact Sylvan to discuss the operations of the professional corporation. Additionally, the professional corporation's mailing address is associated with the number (718-676-7077) that directs GEICO to Sylvan.

140.    In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Healthy Way. For example, it was standard protocol for Healthy Way to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

141.    Beginning with Healthy Way, the Management Defendants effectuated a new scheme to fraudulently bill GEICO and other insurers. The Management Defendants caused Healthy Way to begin to fraudulently unbundle charges for acupuncture services. As discussed previously, this unbundling of charges (effectively causing GEICO to be billed twice for the same services) led to increased profits, which allowed the Management Defendants to siphon off more money than they had previously.

142.    Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports,

42

which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Healthy Way, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Healthy Way contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added). While the "Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Additionally, virtually all reports, including Healthy Way's report, are prepared on a form which only lists the name of the professional corporation and no other information.

### F. The Fraudulent Incorporation and Operation of VS

143. The series of schemes continued with the incorporation of VS, in or about 2006, when the Management Defendants convinced Lendel, like they had with Okslen, to essentially "sell" his acupuncture license to them so that they could fraudulently incorporate VS and use it to submit large-scale fraudulent billing to insurers.

144. In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing VS to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Lendel. In exchange for a designated salary or other form of compensation, in October 2006, Lendel agreed to falsely

43

represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of VS and that he truly owns, controls and practices through the professional corporation.

145. Once VS was fraudulently incorporated on or about October 18, 2006, Lendel ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

146. Lendel never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

147. Throughout the course of Lendel's relationship with the Management Defendants, all decision-making authority relating to the operation and management of VS has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of VS are dispersed by the professional corporation.

148. In reality, Lendel never has been anything more than a de facto employee of the Management Defendants and VS, as he never provided services through the professional corporation. In fact, services were provided by two individuals, one of which, Shkapenyuk, purports to own TC Acupuncture.

44

149.    To conceal their true ownership and control of VS while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Lendel and VS enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of VS.

150.    While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own VS; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through VS. In fact, employees of VS advised GEICO to contact Sylvan to discuss the operations of the professional corporation. Additionally, the professional corporation's mailing address is associated with the number (718-676-7077) that directs GEICO to Sylvan.

151.    In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for VS. For example, it was standard protocol for VS to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

152.    Like with Healthy Way, the Management Defendants continued to cause VS to submit bills to GEICO where the services allegedly provided were fraudulently unbundled causing GEICO to be billed twice for the same services.

153.    Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or

diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by VS, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including VS, contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added). While the "Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Additionally, virtually all reports, including VS' reports, are prepared on a form which only lists the name of the professional corporation and no other information.

### G. The Fraudulent Incorporation and Operation of Alpha

154. The series of schemes continued with the incorporation of Alpha, in or about 2006, when the Management Defendants again convinced Kolomiytseva to essentially "sell" her acupuncture license to them, like they had with Karina K, so that they could fraudulently incorporate Alpha and use it to submit large-scale fraudulent billing to insurers.

155. In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Alpha to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Kolomiytseva, as they had with Karina K. In exchange for a designated salary or other form of compensation, in November 2006, Kolomiytseva agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed

thereafter, that she is the true shareholder, director and officer of Alpha and that she truly owns, controls and practices through the professional corporation.

156. Once Alpha was fraudulently incorporated on or about November 22, 2006, Kolomiytseva ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

157. Kolombiytseva never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

158. Throughout the course of Kolomiytseva's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Alpha has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Alpha are dispersed by the professional corporation.

159. In reality, like with Karina K, Kolomiytseva never has been anything more than a de facto employee of the Management Defendants and Alpha, occasionally providing acupuncture treatments through the professional corporation.

160. To conceal their true ownership and control of Alpha while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Kolomiytseva and Alpha enter into a purported "billing"

47

arrangement with them. This allowed for the Management Defendants to siphon off the profits of Alpha, like it had done with Karina K and the professional corporations before Alpha.

161.     While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own VS; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Alpha. Additionally, the professional corporation's mailing address is associated with the number (718-676-7077) that directs GEICO to Sylvan.

162.     In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Alpha. For example, it was standard protocol for Alpha to bill GEICO for 45- 60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

163.     Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Alpha contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Alpha contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added). While the

48

"Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Additionally, virtually all reports, including Alpha's report, are prepared on a form which only lists the name of the professional corporation and no other information.

### H.    The Fraudulent Incorporation and Operation of Lotus

164.    The series of schemes continued with the incorporation of Lotus, in or about 2007, when the Management Defendants again convinced Kornilova to essentially "sell" her acupuncture license so that they could fraudulently incorporate Lotus and use it to submit large-scale fraudulent billing to insurers.

165.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Lotus to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Kornilova. In exchange for a designated salary or other form of compensation, in January 2007, Kornilova agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she is the true shareholder, director and officer of Lotus and that she truly owns, controls and practices through the professional corporation.

166.    Once Lotus was fraudulently incorporated on or about January 26, 2007, Kornilova ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

167.    Korniolva never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the

49

façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

168.     Throughout the course of Korniolva's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Lotus has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Lotus are dispersed by the professional corporation.

169.     In reality, Kornilova never has been anything more than a de facto employee of the Management Defendants and Lotus, as she never provides acupuncture services through the professional corporation.

170.     To conceal their true ownership and control of Lotus while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Kornilova and Lotus enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Lotus.

171.     While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Lotus; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Lotus.

172. In fact, the treating acupuncturist working at Lotus advised GEICO that they should contact the number (718-676-7077) that directs GEICO to Sylvan in order to speak with his "Boss."

173. The Management Defendants' scheme would include what effectively became their modus operandi for this ongoing fraud. In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Lotus. For example, it was standard protocol for Lotus to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

174. Like with Healthy Way and VS, the Management Defendants continued to cause Lotus to submit bills to GEICO where the services allegedly provided were fraudulently unbundled causing GEICO to be billed twice for the same services.

175. Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Lotus, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Lotus, contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added). While the

"Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Virtually every report from Lotus contains this typographical error in the "Prognosis" section. Additionally, virtually all reports, including Lotus, are prepared on a form which only lists the name of the professional corporation and no other information.

## I. The Fraudulent Incorporation and Operation of Sunrise

176. The series of schemes continued with the incorporation of Sunrise, in or about 2007, when the Management Defendants convinced Tsukanov to essentially "sell" his acupuncture license to them so that they could fraudulently incorporate Sunrise and use it to submit large-scale fraudulent billing to insurers.

177. In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Sunrise to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Tsukanov. In exchange for a designated salary or other form of compensation, in October 2007, Tsukanov agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of Sunrise and that he truly owns, controls and practices through the professional corporation.

178. Once Sunrise was fraudulently incorporated on or about October 25, 2007, Tsukanov ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

179. Tsukanov never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership

and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

180. Throughout the course of Tsukanov's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Sunrise has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Sunrise are dispersed by the professional corporation.

181. In reality, Tsukanov never has been anything more than a de facto employee of the Management Defendants and Sunrise, as he never provided services through the professional corporation.

182. To conceal their true ownership and control of Sunrise while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Tsukanov and Sunrise enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Sunrise.

183. While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Sunrise; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Sunrise. Additionally, the professional corporations mailing address is associated with the number (718-676-7077) that directs GEICO to Sylvan.

184.    In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Sunrise.  For example, it was standard protocol for Sunrise to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

185.    Like with Healthy Way, VS and other PCs, the Management Defendants continued to cause Sunrise to submit bills to GEICO where the services allegedly provided were unbundled causing GEICO to be billed twice for the same services.

186.    Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports.  These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis.  Virtually every report submitted to GEICO by the PC Defendants, including those by Sunrise, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section.  The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Sunrise, contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added).  While the "Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added).  Additionally, virtually all reports, including Sunrise's reports, are prepared on a form which only lists the name of the professional corporation and no other information.

**J.     The Fraudulent Incorporation and Operation of Easy Care**

187.    Continuing over a third year, the Management Defendants furthered their fraudulent scheme with the incorporation of Easy Care, in about 2008, when the Management Defendants convinced Kulagina to essentially "sell" her acupuncture license to them so that they could fraudulently incorporate Easy Care and use it to submit large-scale fraudulent billing to insurers. In fact, the Management Defendants were becoming so brazen in their scheme that the Department of State lists Osipov of the CEO of Easy Care.

188.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Easy Care to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Kulagina. In exchange for a designated salary or other form of compensation, in February 2008, Kulagina agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she is the true shareholder, director and officer of Easy Care and that she truly owns, controls and practices through the professional corporation.

189.    Once Easy Care was fraudulently incorporated on or about February 13, 2008, Kulagina ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

190.    Kulagina never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing

directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

191. Throughout the course of Kulagina's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Easy Care has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Easy Care are dispersed by the professional corporation.

192. In reality, Kulagina never has been anything more than a de facto employee of the Management Defendants and Easy Care.

193. To conceal their true ownership and control of Easy Care while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Kulagina and Easy Care enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Easy Care.

194. While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Easy Care; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Easy Care. In fact, Kulagina advised GEICO to contact Sylvan to discuss the operations of Easy Care. Additionally, the professional corporation's mailing address links to Osipov, one of the owners of Sylvan. Indeed, the New York State Department of State website listed him as the Chairman or Chief Executive Officer of Easy Care.

195.     In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Easy Care. For example, it was standard protocol for Easy Care to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

196.     Like with Healthy Way, VS and other corporations before, the Management Defendants continued to cause Easy Care to submit bills to GEICO where the services allegedly provided were fraudulently unbundled causing GEICO to be billed twice for the same services.

197.     Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Easy Care, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Easy Care, contained the same typographical errors in the "Prognosis" section, with "Prognosis" section stating: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Additionally, virtually all reports, including Easy Care's report, are prepared on a form which only lists the name of the professional corporation and no other information.

### K.  The Fraudulent Incorporation and Operation of Shirom

198.  Getting more and more brazen, the Management Defendants, not content with the incorporation of the first nine PC Defendants, continued their fraudulent scheme with the incorporation of Shirom, in or about 2008, when the Management Defendants convinced Shimunov to essentially "sell" his acupuncture license to them so that they could fraudulently incorporate Shirom and use it to submit large-scale fraudulent billing to insurers.

199.  In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Shirom to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Shimunov. In exchange for a designated salary or other form of compensation in April, 2008, Shimunov agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of Shirom and that he truly owns, controls and practices through the professional corporation.

200.  Once Shirom was fraudulently incorporated on or about April 15, 2008, Shimunov ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

201.  Shimunov never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

202. Throughout the course of Shimunov's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Shirom has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Shirom are dispersed by the professional corporation.

203. In reality, Shimunov never has been anything more than a de facto employee of the Management Defendants and Shirom.

204. To conceal their true ownership and control of Shirom while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Shimunov and Shirom enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Shirom.

205. While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Shirom; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Shirom. In fact, the treating acupuncturist working at Shirom advised GEICO to contact Sylvan to discuss the operations of Shirom. Additionally, the professional corporation's mailing address is associated with Sylvan.

206. In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Shirom. For example, it was standard protocol for Shirom to bill GEICO for 45-60 minutes of

59

treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

207. Like with Healthy Way, VS and other corporations before, the Management Defendants continued to cause Shirom to submit bills to GEICO where the services allegedly provided were fraudulently unbundled, causing GEICO to be billed twice for the same services.

208. Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Shirom, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Shirom, contained the same typographical errors in the "Prognosis" section, with the "Prognosis" section stating: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Virtually every report from Shirom contains this typographical error in the "Prognosis" section. Additionally, virtually all reports, including Shirom's reports, are prepared on a form which only lists the name of the professional corporation and no other information.

### L. The Fraudulent Incorporation and Operation of Urban Well

209. The Management Defendants, not content with the incorporation of the first ten PC Defendants, continued their fraudulent scheme with the incorporation of Urban Well, only a month after the incorporation of Shirom, in or about 2008. The Management Defendants

convinced Abitbol to essentially "sell" her acupuncture license to them so that they could fraudulently incorporate Urban Well and use it to submit large-scale fraudulent billing to insurers.

210.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Urban Well to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Abitbol. In exchange for a designated salary or other form of compensation, in May 2008, Abitbol agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she is the true shareholder, director and officer of Urban Well and that she truly owns, controls and practices through the professional corporation.

211.    Once Urban Well was fraudulently incorporated on or about May 21, 2008, Abitbol ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

212.    Abitbol never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation.  True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

213.    Throughout the course of Abitbol's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Urban Well has been vested entirely with the Management Defendants.  This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services;

the control over how the services will be billed to insurers, including GEICO; and how the profits of Urban Well are dispersed by the professional corporation.

214. In reality, Abitbol never has been anything more than a de facto employee of the Management Defendants and Urban Well.

215. To conceal their true ownership and control of Urban Well while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Abitbol and Urban Well enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Urban Well.

216. While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Urban Well; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Urban Well. In fact, the treating acupuncturist working at Urban Well did not know who the owner of the corporation was, despite being offered a job at Urban Well by his friend "Ilona," and he did not know who his boss was. All he knew was that once a month, someone from the "billing company" picked up the treatment notes he prepared and drops off needles. Further, the acupuncturist admitted after reviewing his treatment notes and after seeing bills submitted to GEICO that he did not treat the patients for the amount of time submitted on the bills. Additionally, at one of the locations where Urban Well provides services, GEICO was directed to Sylvan in order to obtain further information about Urban Well. Lastly, the professional corporation's mailing address on bills submitted from that location is associated with Sylvan.

217.    In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Urban Well. For example, it was standard protocol for Urban Well to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

218.    Like with Healthy Way, VS and other corporations before, the Management Defendants continued to cause Urban Well to submit bills to GEICO where the services allegedly provided were fraudulently unbundled, causing GEICO to be billed twice for the same services.

219.    Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Urban Well, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Urban Well, contained the same typographical errors in the "Prognosis" section, with the "Prognosis" section stating: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Virtually every report from Urban Well contains this typographical error in the "Prognosis" section Additionally, virtually all reports, including Urban Well, are prepared on a form which only lists the name of the professional corporation and no other information.

**M.    The Fraudulent Incorporation and Operation of Approach**

220.    The Management Defendants continued their fraudulent scheme with the incorporation of Approach, only a month after the incorporation of Urban Well, in or about 2008. The Management Defendants convinced Zapolsky to essentially "sell" his acupuncture license to them so that they could fraudulently incorporate Approach and use it to submit large-scale fraudulent billing to insurers.

221.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Approach to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Zapolsky. In exchange for a designated salary or other form of compensation, in December 2008, Zapolsky agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of Approach and that he truly owns, controls and practices through the professional corporation.

222.    Once Approach was fraudulently incorporated on or about December 26, 2008, Zapolsky ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

223.    Zapolsky never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

224. Throughout the course of Zapolsky's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Approach has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Approach are dispersed by the professional corporation.

225. In reality, Zapolsky never has been anything more than a de facto employee of the Management Defendants and Approach.

226. To conceal their true ownership and control of Approach while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Zapolsky and Approach enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Approach.

227. While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Urban Well; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Approach. Like so many other of the PC Defendants, the professional corporation's mailing address is associated with Sylvan.

228. In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Approach. For example, it was standard protocol for Approach to bill GEICO for 45-60 minutes

of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

229.    Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Approach, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Approach, contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added). While the "Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Additionally, virtually all reports are prepared on a form which only lists the name of the professional corporation and no other information.

N.     **The Fraudulent Incorporation and Operation of SML**

230.    The Management Defendants continued their fraudulent scheme with the incorporation of SML in or about 2009. The Management Defendants, again, utilizing a familiar ally, convinced Kulagina, to essentially "sell" her acupuncture license to them so that they could fraudulently incorporate SML and use it to submit large-scale fraudulent billing to insurers, like she had with Easy Care.

231.     In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing SML to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Kulagina. In exchange for a designated salary or other form of compensation, in May 2009, Kulagina agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she is the true shareholder, director and officer of SML and that she truly owns, controls and practices through the professional corporation.

232.     Once SML was fraudulently incorporated on or about May 11, 2009, Kulagina, (once again) ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

233.     Kulagina never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

234.     Throughout the course of Kulagina's relationship with the Management Defendants, all decision-making authority relating to the operation and management of SML has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of SML are dispersed by the professional corporation.

235.     In reality, Kulagina never has been anything more than a de facto employee of the Management Defendants and SML, as she only occasionally provided acupuncture treatments through the professional corporation.

236.     To conceal their true ownership and control of SML while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Kulagina and SML enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of SML.

237.     While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own SML; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through SML.   Like so many other of the PC Defendants, the professional corporation's mailing address is associated with Sylvan, much like Easy Care.

238.     In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for SML. For example, it was standard protocol for SML to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

239.     Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by SML, contain the exact same language in the "Treatments and Recommendations" section, the

"Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including SML, contained the same typographical errors in the "Prognosis" section, with the "Prognosis" section stating: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Virtually every report from SMIL contains this typographical error in the "Prognosis" section Additionally, virtually all reports, including SML's report, are prepared on a form which only lists the name of the professional corporation and no other information.

### O. The Fraudulent Incorporation and Operation of Bronx Therapy

240. The Management Defendants continued their fraudulent scheme with the incorporation of Bronx Therapy in or about 2009. The Management Defendants, again, utilizing a familiar ally, convinced Shimunov, to essentially "sell" his acupuncture license to them so that they could fraudulently incorporate Bronx Therapy and use it to submit large-scale fraudulent billing to insurers, like he had with Shirom.

241. In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Bronx Therapy to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Shimunov. In exchange for a designated salary or other form of compensation, in December, 2009, Shimunov agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of Bronx Therapy and that he truly owns, controls and practices through the professional corporation.

242.    Once Bronx Therapy was fraudulently incorporated on or about December 4, 2009, Shimunov, (once again) ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

243.    Shimunov never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

244.    Throughout the course of Shimunov's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Bronx Therapy has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Bronx Therapy are dispersed by the professional corporation.

245.    In reality, Shimunov never has been anything more than a de facto employee of the Management Defendants and Bronx Therapy, as he only occasionally provided acupuncture treatments through the professional corporation.

246.    To conceal their true ownership and control of Bronx Therapy while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Shimunov and Bronx Therapy enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Bronx Therapy.

70

247. While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Bronx Therapy; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Bronx Therapy. Like so many other of the PC Defendants, the professional corporation's mailing address is associated with Sylvan, like Shirom.

248. In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Bronx Therapy. For example, it was standard protocol for Bronx Therapy to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

249. Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO, including those by Bronx Therapy, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Bronx Therapy, contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added).

71

While the "Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Additionally, virtually all reports by the PC Defendants, including Bronx Therapy, are prepared on a form which only lists the name of the professional corporation and no other information.

**P.      The Fraudulent Incorporation and Operation of TC**

250.    The Management Defendants continued their fraudulent scheme with the incorporation of its sixteenth PC, TC in or about 2010. The Management Defendants convinced Shkapenyuk (whom they were familiar with as he rendered acupuncture services at one of the other PCs), to essentially "sell" his acupuncture license to them so that they could fraudulently incorporate TC and use it to submit large-scale fraudulent billing to insurers.

251.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing TC to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Shkapenyuk. In exchange for a designated salary or other form of compensation, in June 2010, Shkapenyuk agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of TC and that he truly owns, controls and practices through the professional corporation.

252.    Once TC was fraudulently incorporated on or about June 24, 2010, Shkapenyuk ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

253.    Shkapenyuk never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation.    True

72

ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

254.    Throughout the course of Shkapenyuk's relationship with the Management Defendants, operation and management of TC has been vested entirely with the Management Defendants.  This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of TC are dispersed by the professional corporation.

255.    In reality, Shkapenyuk never has been anything more than a de facto employee of the Management Defendants and TC, as he only occasionally provided acupuncture treatments through the professional corporation.

256.    To conceal their true ownership and control of TC while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Shkapenyuk and TC enter into a purported "billing" arrangement with them.  This allowed for the Management Defendants to siphon off the profits of TC.

257.    While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own TC; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through TC.  Like so many other of the PC Defendants, the professional corporation's mailing address is associated with Sylvan.

258.   Like with Healthy Way, VS and other corporations before, the Management Defendants continued to cause TC to submit bills to GEICO where the services allegedly provided were unbundled causing GEICO to be billed twice for the same services.

259.   In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for TC. For example, it was standard protocol for TC to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

260.   Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by TC, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including TC, contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added).  While the "Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added).  Additionally, virtually all reports, including TC's reports, are prepared on a form which only lists the name of the professional corporation and no other information.

**Q.    The Fraudulent Incorporation and Operation of Acuhealth**

261. The Management Defendants continued their fraudulent scheme with the incorporation of Acuhealth, on the same day as TC. The Management Defendants, utilizing a familiar ally, convinced Kornilova, to essentially "sell" her acupuncture license to them so that they could fraudulently incorporate Acuhealth and use it to submit large-scale fraudulent billing to insurers, like she had with Lotus.

262. In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Acuhealth to operate an acupuncture practice, the Management Defendants again entered into a similar secret scheme with Kornilova. In exchange for a designated salary or other form of compensation, in June 2010, Kornilova agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she is the true shareholder, director and officer of Acuhealth and that she truly owns, controls and practices through the professional corporation.

263. Once Acuhealth was fraudulently incorporated on or about June 24, 2010, Kornilova, (once again) ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

264. Kornilova never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

265.    Throughout the course of Kornilova's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Acuhealth has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Acuhealth are dispersed by the professional corporation.

266.    In reality, Kornilova never has been anything more than a de facto employee of the Management Defendants and Acuhealth, as she does not even provide any services through the professional corporation.

267.    To conceal their true ownership and control of Acuhealth while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Kornilova and Acuhealth enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Acuhealth.

268.    While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own Acuhealth; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Acuhealth. Like so many other of the PC Defendants, the professional corporation's mailing address is associated with Sylvan.

269.    In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Acuhealth. For example, it was standard protocol for Acuhealth to bill GEICO for 45-60

minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

270.    Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Acuhealth, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Acuhealth, contained the same typographical errors in the "Prognosis" section, with "Prognosis" section stating: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Virtually every report from Acuhealth contains this typographical error in the "Prognosis" section Additionally, virtually all reports, including Acuhealth, are prepared on a form which only lists the name of the professional corporation and no other information.

**R.    The Fraudulent Incorporation and Operation of NR**

271.    The Management Defendants continued their fraudulent scheme well into 2010, with the incorporation of NR in or about 2010. The Management Defendants convinced Razzakova, to essentially "sell" her acupuncture license to them so that they could fraudulently incorporate NR and use it to submit large-scale fraudulent billing to insurers.

272.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing NR to operate an acupuncture practice,

the Management Defendants entered into a similar secret scheme with Razzakova. In exchange for a designated salary or other form of compensation, in October 2010, Razzakova agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she is the true shareholder, director and officer of NR and that she truly owns, controls and practices through the professional corporation.

273. Once NR was fraudulently incorporated on or about October 4, 2010, Razzakova ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

274. Razzakova never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

275. Throughout the course of Razzakova's relationship with the Management Defendants, the operation and management of NR has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of NR are dispersed by the professional corporation.

276. In reality, Razzakova never has been anything more than a de facto employee of the Management Defendants and NR, as she only occasionally provided acupuncture treatments through the professional corporation.

277. To conceal their true ownership and control of NR while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Razzakova and NR enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of NR.

278. While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own NR; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through NR. In fact, Razzakova admitted that her "boss" was Anikayeva and that he "runs the whole thing." Like so many other of the PC Defendants, the professional corporation's mailing address is associated with Sylvan.

279. In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for NR. For example, it was standard protocol for NR to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

280. Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by NR, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations,

including NR's reports, contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "<u>I fell that there is a direct casual relationship</u> between the accident described and current injuries." (emphasis added). While the "Prognosis" section states: "<u>The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded</u>." (emphasis added). Additionally, virtually all reports, including NR's reports, are prepared on a form which only lists the name of the professional corporation and no other information.

### S. The Fraudulent Incorporation and Operation of Silver Lotus

281.    The Management Defendants continued their fraudulent scheme well into 2010, with the incorporation of Silver Lotus, only a few months after NR, in or about 2010. The Management Defendants convinced Tsukanov, like they had when they incorporated Sunrise, to essentially "sell" his acupuncture license to them so that they could fraudulently incorporate Silver Lotus and use it to submit large-scale fraudulent billing to insurers.

282.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Silver Lotus to operate an acupuncture practice, the Management Defendants again, entered into a similar secret scheme with Tsukanov. In exchange for a designated salary or other form of compensation, in December 2010, Tsukanov agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of Silver Lotus and that he truly owns, controls and practices through the professional corporation.

283. Once Silver Lotus was fraudulently incorporated on or about December 2, 2010, Tsukanov ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

284. Tsukanov never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

285. Throughout the course of Tsukanov's relationship with the Management Defendants, the operation and management of Silver Lotus has been vested entirely with the Management Defendants. This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of Silver Lotus are dispersed by the professional corporation.

286. In reality, Tsukanov never has been anything more than a de facto employee of the Management Defendants and Silver Lotus, as he does not even provide services through the professional corporation.

287. To conceal their true ownership and control of Silver Lotus while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Tsukanov and Silver Lotus enter into a purported "billing" arrangement with them. This allowed for the Management Defendants to siphon off the profits of Silver Lotus.

288.    While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own NR; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Silver Lotus. In fact, GEICO was advised to contact Sylvan to discuss questions about Silver Lotus. Further, like so many other of the PC Defendants, the professional corporation's mailing address is associated with Sylvan.

289.    In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for Silver Lotus. For example, it was standard protocol for Silver Lotus to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

290.    Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by Silver Lotus, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including Silver Lotus, contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis

added). While the "Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Additionally, virtually all reports, including Silver Lotus' reports, are prepared on a form which only lists the name of the professional corporation and no other information.

### T. The Fraudulent Incorporation and Operation of New Century

291. The Management Defendants continued their fraudulent scheme well into 2010, with the incorporation of New Century, shortly after Silver Lotus was incorporated. The Management Defendants convinced Kondranina to essentially "sell" his acupuncture license to them so that they could fraudulently incorporate New Century and use it to submit large-scale fraudulent billing to insurers.

292. In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing New Century to operate an acupuncture practice, the Management Defendants entered into a similar secret scheme with Kondranina. In exchange for a designated salary or other form of compensation, in December 2010, Kondranina agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of New Century and that he truly owns, controls and practices through the professional corporation.

293. Once New Century was fraudulently incorporated on or about December 9, 2010, Kondranina ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

294. Kondranina never has been the true shareholder, director, or officer, and never has had any true ownership interest in or control over the professional corporation. True ownership

83

and control has rested at all times entirely with the Management Defendants, who have used the façade of the professional corporation to do indirectly what they are forbidden from doing directly, namely to: (i) employ acupuncturists; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

295.    Throughout the course of Kondranina's relationship with the Management Defendants, the operation and management of New Century has been vested entirely with the Management Defendants.    This includes control over the treatment protocols for patients; the hiring of acupuncturists who allegedly perform the services; the control over how the services will be billed to insurers, including GEICO; and how the profits of New Century are dispersed by the professional corporation.

296.    In reality, Kondranina never has been anything more than a de facto employee of the Management Defendants and New Century.

297.    To conceal their true ownership and control of New Century while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Kondranina and New Century enter into a purported "billing" arrangement with them.    This allowed for the Management Defendants to siphon off the profits of New Century.

298.    While the "billing" arrangement ostensibly was created to permit the Management Defendants to provide alleged billing services, it was actually used solely as a tool to permit them: (i) to control the day-to-day operations, exercise supervisory authority over, and illegally own NR; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through Silver Lotus.    Like so many other of the PC Defendants, the professional corporation's mailing address is associated with Sylvan.

299. In addition to controlling the operations of the professional corporation, the Management Defendants supervised and controlled the treatment and billing protocols for New Century. For example, it was standard protocol for New Century to bill GEICO for 45-60 minutes of treatment, per patient, per day, knowing very well that no patient received 45-60 minutes of treatment.

300. Further, the Management Defendants would require the professional corporations to provide insurers, including GEICO, with fraudulent initial examination reports. These reports, which started with Okslen and continued uninterrupted throughout the entire scheme are nothing more than boilerplate, template reports that do not change based on the patients' symptoms or diagnosis. Virtually every report submitted to GEICO by the PC Defendants, including those by New Century, contain the exact same language in the "Treatments and Recommendations" section, the "Comments" section, and the "Prognosis" section. The Management Defendants were so brazen in their scheme that virtually every report, submitted by the twenty professional corporations, including New Century, contained the same typographical errors in the "Comments" and "Prognosis" sections, with the "Comments" section containing the phrase, "I fell that there is a direct casual relationship between the accident described and current injuries." (emphasis added). While the "Prognosis" section states: "The prognosis of the patient's consultation in regard to a full and complete recovery to state as exited to the accident is guarded." (emphasis added). Additionally, virtually all reports, including New Century's reports, are prepared on a form which only lists the name of the professional corporation and no other information.

**IV.    The Defendants' Submission of Fraudulent NF-3 Forms to GEICO**

301. To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits (i.e., NF-3 Forms) consistently have been submitted to GEICO by and on behalf of the Defendants seeking payment for services for which the PC Defendants are ineligible to receive payment.

302. The NF-3 forms submitted to GEICO by and on behalf of the Defendants are false and misleading in the following material respects:

(i) The NF-3 forms uniformly misrepresent to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not properly licensed in that they are acupuncture professional corporations that were fraudulently incorporated and have been owned and controlled by the Management Defendants, who are not licensed or certified acupuncturists.

(ii) The NF-3 forms uniformly misrepresent to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not properly licensed in that they are acupuncture professional corporations that engage in unlawful fee-splitting with the Management Defendants, who are not licensed or certified acupuncturists.

(iii) The NF-3 forms uniformly misrepresent to GEICO that the pertinent acupuncture services are medically necessary and performed in accordance with basic, legitimate acupuncture treatment practices. In fact, to the extent that they are performed at all, the pertinent acupuncture services are not performed in accordance with basic, legitimate acupuncture treatment practices. As such, the services that actually are provided – to the extent that they were provided at all – are not medically necessary.

(iv) The NF-3 forms uniformly misrepresent to GEICO that the Insureds receive three to four units of treatment, consisting of 45 to 60 minutes of personal, one-on-one contact with the acupuncturists on each treatment date, and that needles are removed and then reinserted into the Insureds' bodies on each treatment date. In fact, the Insureds typically spend fifteen minutes or less with the acupuncturists on each treatment date – to the extent that they see the acupuncturists at all – and needles are not removed and then reinserted into the Insureds' bodies on each treatment date, or any of them.

V.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

303.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or caused to be submitted, to GEICO.

304.    To induce GEICO to promptly pay the fraudulent charges for the fraudulent acupuncture services, the Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this concealment.

305.    Specifically, the Defendants knowingly have misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery that the professional corporations are unlawfully incorporated, owned and controlled by non-acupuncturists and engage in fee splitting, and therefore are ineligible to bill for or collect No-Fault Benefits. For example, the Defendants misrepresented the Nominal Owner Defendants' ownership of and control over the PC Defendants in filings with the New York State Department of Education, so as to induce the New York State Department of Education to issue the licenses required to permit acupuncture to be practiced through the PC Defendants. Additionally, the Management Defendants entered into financial arrangements with the PC Defendants that were designed to, and did, conceal their true ownership of and control over the PC Defendants.

306.    Likewise, in every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly misrepresented that the PC Defendants properly were incorporated, lawfully licensed, and eligible to bill for and collect No-Fault Benefits, when in fact they were not.

307.    Furthermore, the Defendants knowingly have misrepresented and concealed facts in order to prevent GEICO from discovering that the acupuncture services were performed pursuant to a fraudulent pre-determined protocol without regard to medical necessity, designed

to maximize the charges that could be submitted, and that the charges for such services were fraudulently inflated and exaggerated.

308. What is more, the Defendants have created twenty professional corporations with different tax identification numbers in order to reduce the amount of billing submitted through any single professional corporation, in an attempt to prevent GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

309. The Defendants have further concealed their fraud by refusing to provide information to GEICO, directing GEICO to an unidentified entity (later identified as Sylvan) to answer questions concerning the operations, ownership, and billing relating to the PC Defendants but having that entity deny knowledge of the PC Defendants and refuse to even disclose the name of the entity itself or the names of anyone associated with the PC Defendants who could answer questions for GEICO.

310. The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

311. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $8,195,679.00 dollars based upon the fraudulent charges representing payments made by GEICO on or after April 4, 2002.

312.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
### Against the PC Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

313.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 312 above.

314.    There is an actual case in controversy between GEICO and the PC Defendants regarding more than $9,882,972.00 dollars in fraudulent billing for acupuncture services that has been submitted to GEICO.

315.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because they are fraudulently incorporated and are owned and controlled by persons not licensed to practice acupuncture in New York State and, therefore, are ineligible to seek or recover No-Fault Benefits.

316.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the professional corporations engaged in unlawful fee-splitting with unlicensed individuals and entities.

317.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the billed-for services were fraudulently inflated and exaggerated, were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control the PC Defendants in contravention of New York law, and in many cases were not performed at all.

318. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i) The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because these professional corporations are fraudulently incorporated, owned and/or controlled by non-acupuncturists and, therefore, are ineligible to seek or recover No-Fault Benefits;

(ii) The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because these professional corporations engaged in unlawful fee-splitting with non-acupuncturists; and

(iii) The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the billed-for services were fraudulently inflated and exaggerated, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol with regard to the actual medical necessity of the treatments designed solely to enrich the unlicensed individuals and entities that own and control the PC Defendants in contravention of New York law, and in many cases were not performed at all.

## SECOND CAUSE OF ACTION
### Against all Defendants
### (Common Law Fraud)

319. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 318 above.

320. The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for acupuncture services.

321. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the PC Defendants are properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact they are fraudulently incorporated and actually owned and controlled by non-acupuncturists; (ii) in every claim, the representation that

90

the PC Defendants are properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engages in illegal fee-splitting with non-acupuncturists; (iii) in every claim, the representation that the billed-for services were medically necessary, and properly billed, when in fact the billed-for services were not medically necessary, were inflated, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control the PC Defendants in contravention of New York law, and in many cases were not performed at all.

322.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the PC Defendants that were not compensable under the No-Fault Laws.

323.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $8,519,292.00 pursuant to the fraudulent bills submitted by the Defendants through the PC Defendants.

324.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

325.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Against all Defendants
### (Unjust Enrichment)

326.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 325 above.

327.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

328.    When GEICO paid the bills and charges submitted by or on behalf of the PC Defendants' No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

329.    The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

330.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

331.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $8,519,292.00.

## FOURTH CAUSE OF ACTION
### Against Lendel, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

332.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 331 above.

333.    Okslen Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

334.    Lendel, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Okslen's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for six years seeking payments that Okslen

92

was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Okslen in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5."

335. Okslen's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lendel, Sylvan, Osipov and Anikeyev operate Health, insofar as Okslen never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Okslen to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Okslen to the present day.

336. Okslen is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Okslen likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other

insurers. These inherently unlawful acts are taken by Okslen in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

337.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $891,400.00 pursuant to the fraudulent bills submitted by the Defendants through Okslen since November 12, 2004.

338.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**FIFTH CAUSE OF ACTION**
**Against Lendel, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

</div>

339.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 338 above.

340.    Okslen Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

341.    Lendel, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Okslen enterprise.

342.    Lendel, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Okslen enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Okslen was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and

owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Okslen in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5." Each such mailing was made in furtherance of the mail fraud scheme.

343. Lendel, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

344. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $891,400.00 pursuant to the fraudulent bills submitted by the Defendants through Okslen.

345. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against Bay Needle Acupuncture, PC, Matskina, Sylvan, Osipov and Anikeyev
(Violation of RICO, 18 U.S.C. § 1962(c))**

346. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 345 above.

347.    Bay Needle Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

348.    Matskina, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Bay Needle's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over six years seeking payments that Bay Needle was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Bay Needle in contravention of New York law, and in many cases were not performed at all.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6."

349.    Bay Needle's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Matskina, Sylvan, Osipov and Anikeyev operate Bay Needle, insofar as Bay Needle never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Bay Needle to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued

criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Bay Needle to the present day.

350. Bay Needle is engaged in inherently unlawful acts, inasmuch as it's very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Bay Needle likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bay Needle in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

351. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $279,896.00 pursuant to the fraudulent bills submitted by the Defendants through Bay Needle since March 14, 2005.

352. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Matskina, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

353. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 352 above.

354. Bay Needle, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

355.    Matksina, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Bay Needle enterprise.

356.    Matksina, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Bay Needle enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Bay Needle was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Bay Needle in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6." Each such mailing was made in furtherance of the mail fraud scheme.

357.    Matksina, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

358.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $279,896.00 pursuant to the fraudulent bills submitted by the Defendants through Bay Needle.

359.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Kapustina, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

360.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 359 above.

361.     Perfect Point Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

362.     Kapustina, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Perfect Point's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for almost six years seeking payments that Perfect Point was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Perfect Point in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7."

363.    Perfect Point's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kapustina, Sylvan, Osipov and Anikeyev operate Perfect Point, insofar as Perfect Point never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Perfect Point to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Perfect Point to the present day.

364.    Perfect Point is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Perfect Point likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Perfect Point in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

365.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $348,542.00 pursuant to the fraudulent bills submitted by the Defendants through Perfect Point since September 23, 2005.

366.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Kapustina, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(d))

367.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

368.    Perfect Point Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

369.    Kapustina, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Perfect Point enterprise.

370.    Kapustina, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Perfect Point enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Perfect Point was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Perfect Point in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7." Each such mailing was made in furtherance of the mail fraud scheme.

371.    Kapustina, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

372.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $348,542.00 pursuant to the fraudulent bills submitted by the Defendants through Perfect Point.

373.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Kolomiytseva, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

374.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 373 above.

375.    Karina K Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

376.    Kolomiytseva, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Karina K's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years seeking payments that Karina K was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were

performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Karina K in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8."

377.    Karina K's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kolomiytseva, Sylvan, Osipov and Anikeyev operate Karina K, insofar as Karina K never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Karina K to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Karina K to the present day.

378.    Karina K is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Karina K likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Karina K in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

379.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $681,471.00 pursuant to the fraudulent bills submitted by the Defendants through Karina K since May 16, 2006.

380.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
#### Against Kolomiytseva, Sylvan, Osipov and Anikeyev
#### (Violation of RICO, 18 U.S.C. § 1962(d))

381.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 380 above.

382.   Karina K Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

383.   Kolomiytseva, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Karen K enterprise.

384.   Kolomiytseva, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Karina K enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Karen K was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to

104

enrich the unlicensed individuals and entities that own and control Karina K in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8." Each such mailing was made in furtherance of the mail fraud scheme.

385.    Kolomiytseva, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

386.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $681,471.00 pursuant to the fraudulent bills submitted by the Defendants through Karina K.

387.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Matskina, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

388.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 387 above.

389.    Healthy Way Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

390.    Matskina, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Healthy Way's affairs through a pattern of

105

racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for almost five years seeking payments that Healthy Way was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Healthy Way in contravention of New York law, and in many cases were not performed at all.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9."

391.    Healthy Way's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Matskina, Sylvan, Osipov and Anikeyev operate Healthy Way, insofar as Healthy Way never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Healthy Way to function.   Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Healthy Way to the present day.

392.    Healthy Way is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing

misrepresentations made to the New York State Department of Education and the New York State Department of State. Healthy Way likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Healthy Way in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

393.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,086,027.00 pursuant to the fraudulent bills submitted by the Defendants through Healthy Way since August 21, 2006.

394.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Matskina, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(d))

395.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 394 above.

396.    Healthy Way Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

397.    Matksina, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Healthy Way enterprise.

398.    Matksina, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Healthy Way enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of

107

the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Healthy Way was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Healthy Way in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9." Each such mailing was made in furtherance of the mail fraud scheme.

399.    Matksina, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

400.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,086,027.00 pursuant to the fraudulent bills submitted by the Defendants through Healthy Way.

401.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**FOURTEENTH CAUSE OF ACTION**
**Against Lendel, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

</div>

402.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 401 above.

403.   VS Care Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

404.   Lendel, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of VS's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over three years seeking payments that VS Care was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control VS in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10."

405.   VS business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lendel, Sylvan, Osipov and Anikeyev operate VS, insofar as VS never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for VS to function. Furthermore, the intricate planning required to carry out and conceal

the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through VS to the present day.

406.  VS is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. VS likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by VS in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

407.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $708,937.00 pursuant to the fraudulent bills submitted by the Defendants through VS since October 18, 2006.

408.  By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Lendel, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

409.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 408 above.

410.  VS Care Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

110

411.     Lendel, Sylvan, Osipov and Anikeyev are employed by and/or associated with the VS Care enterprise.

412.     Lendel, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the VS enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that VS was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control VS in contravention of New York law, and in many cases were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10." Each such mailing was made in furtherance of the mail fraud scheme.

413.     Lendel, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

414.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $708,937.00 pursuant to the fraudulent bills submitted by the Defendants through VS.

111

415.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against Kolomiytseva, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

416.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 415 above.

417.   Alpha Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

418.   Kolomiytseva, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Alpha's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over four years seeking payments that Alpha was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Alpha in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11."

419.     Alpha's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Kolomiytseva, Sylvan, Osipov and Anikeyev operate Alpha, insofar as Alpha never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Alpha to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Alpha to the present day.

420.     Alpha is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Alpha likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Alpha in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

421.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $204,713.00 pursuant to the fraudulent bills submitted by the Defendants through Alpha since November 22, 2006.

422.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against Kolomiytseva, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(d))

423. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 422 above.

424. Alpha Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

425. Kolomiytseva, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Alpha enterprise.

426. Kolomiytseva, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Alpha's enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Alpha was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Alpha in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11." Each such mailing was made in furtherance of the mail fraud scheme.

427.    Kolomiytseva, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

428.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $204,713.00 pursuant to the fraudulent bills submitted by the Defendants through Alpha.

429.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against Kornilova, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

430.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 429 above.

431.    Lotus Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

432.    Kornilova, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Lotus' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over four years seeking payments that Lotus was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were

115

performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Lotus in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "12."

433.  Lotus' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kornilova, Sylvan, Osipov and Anikeyev operate Lotus, insofar as Lotus never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Lotus to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Lotus to the present day.

434.  Lotus is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Lotus likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Lotus in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

116

435.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,022,413.00 pursuant to the fraudulent bills submitted by the Defendants through Lotus since January 26, 2007.

436.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINETEENTH CAUSE OF ACTION
**Against Kornilova, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

437.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 436 above.

438.   Lotus Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

439.   Kornilova, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Lotus enterprise.

440.   Kornilova, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Lotus enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Lotus was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to

117

enrich the unlicensed individuals and entities that own and control Lotus in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "12." Each such mailing was made in furtherance of the mail fraud scheme.

441. Kornilova, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

442. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,022,413.00 pursuant to the fraudulent bills submitted by the Defendants through Lotus.

443. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION
### Against Tsukanov, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

444. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 443 above.

445. Sunrise Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

446. Tsukanov, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Sunrise's affairs through a pattern of

racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over three years seeking payments that Sunrise was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Sunrise in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "13."

447. Sunrise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Tsukanov, Sylvan, Osipov and Anikeyev operate Sunrise, insofar as Sunrise never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Sunrise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Sunrise to the present day.

448. Sunrise is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing

misrepresentations made to the New York State Department of Education and the New York State Department of State. Sunrise likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Sunrise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

449.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $770,785.00 pursuant to the fraudulent bills submitted by the Defendants through Sunrise since October 25, 2007.

450.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
### Against Tsukanov, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(d))

451.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 450 above.

452.    Sunrise Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

453.    Tsukanov, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Sunrise enterprise.

454.    Tsukanov, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Sunrise enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of

the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Sunrise was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Sunrise in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "13." Each such mailing was made in furtherance of the mail fraud scheme.

455. Tsukanov, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

456. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $770,785.00 pursuant to the fraudulent bills submitted by the Defendants through Sunrise.

457. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**TWENTY-SECOND CAUSE OF ACTION**
**Against Kulagina, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

</div>

458. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 457 above.

459. Easy Care Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

460. Kulagina, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Easy Care's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over three years seeking payments that Easy Care was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Easy Care in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "14."

461. Easy Care's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kulagina, Sylvan, Osipov and Anikeyev operate Easy Care, insofar as Easy Care never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Easy Care to function. Furthermore, the intricate planning

required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Easy Care to the present day.

462.    Easy Care is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Easy Care likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Easy Care in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

463.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $644,998.00 pursuant to the fraudulent bills submitted by the Defendants through Easy Care since February 13, 2008.

464.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-THIRD CAUSE OF ACTION
### Against Kulagina, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(d))

465.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 464 above.

123

466.    Easy Care Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

467.    Kulagina, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Easy Care enterprise.

468.    Kulagina, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Easy Care enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Easy Care was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Easy Care in contravention of New York law, and in many cases were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "14."  Each such mailing was made in furtherance of the mail fraud scheme.

469.    Kulagina, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

124

470.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $644,998.00 pursuant to the fraudulent bills submitted by the Defendants through Easy Care.

471.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**TWENTY-FOURTH CAUSE OF ACTION**
**Against Shimunov, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

</div>

472.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 471 above.

473.    Shirom Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

474.    Shimunov, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Shirom's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over three years seeking payments that Shirom was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Shirom in contravention of New York law, and in many cases were not performed at all.  A representative

sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "15."

475.    Shirom's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Shimunov, Sylvan, Osipov and Anikeyev operate Shirom, insofar as Shirom never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Shirom to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Shirom to the present day.

476.    Shirom is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Shirom likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Shirom in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

477.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $365,691.00 pursuant to the fraudulent bills submitted by the Defendants through Shirom since April 15, 2008.

478.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Shimunov, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(d))

479.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 478 above.

480.    Shirom Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

481.    Shimunov, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Shirom enterprise.

482.    Shimunov, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Shirom enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Shirom was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Shirom in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the

pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "15." Each such mailing was made in furtherance of the mail fraud scheme.

483.   Shimunov, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

484.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $365,691.00 pursuant to the fraudulent bills submitted by the Defendants through Shirom.

485.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**TWENTY-SIXTH CAUSE OF ACTION**
**Against Abitbol, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

</div>

486.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

487.   Urban Well Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

488.   Abitbol, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Urban Well's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over three years seeking payments that

<div align="center">128</div>

Urban Well was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Urban Well in contravention of New York law, and in many cases were not performed at all.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "16."

489.    Urban Well's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Abitbol, Sylvan, Osipov and Anikeyev operate Urban Well, insofar as Urban Well never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Urban Well to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Urban Well to the present day.

490.    Urban Well is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Urban Well likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and

other insurers. These inherently unlawful acts are taken by Urban Well in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

491.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,228.00 pursuant to the fraudulent bills submitted by the Defendants through Urban Well since May 21, 2008.

492.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**TWENTY-SEVENTH CAUSE OF ACTION**
**Against Abitbol, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

</div>

493.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 492 above.

494.    Urban Well Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

495.    Abitbol, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Urban Well enterprise.

496.    Abitbol, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Urban Well enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Urban Well was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated

and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Urban Well in contravention of New York law, and in many cases were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "16."  Each such mailing was made in furtherance of the mail fraud scheme.

497.  Abitbol, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

498.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $350,228.00 pursuant to the fraudulent bills submitted by the Defendants through Urban Well.

499.  By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-EIGHTH CAUSE OF ACTION
### Against Zapolsky, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

500.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 499 above.

501. Acupuncture Approach, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

502. Zapolsky, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Approach's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over two years seeking payments that Approach was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Approach in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "17."

503. Approach's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zapolsky, Sylvan, Osipov and Anikeyev operate Approach, insofar as Approach never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Approach to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued

criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Approach to the present day.

504.    Approach is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Approach likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Approach in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

505.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $380,593.00 pursuant to the fraudulent bills submitted by the Defendants through Approach since December 26, 2008.

506.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div style="text-align:center">

**TWENTY-NINTH CAUSE OF ACTION**
**Against Zapolsky, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

</div>

507.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 506 above.

508.    Acupuncture Approach, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

<div style="text-align:center">133</div>

509.    Zapolsky, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Approach enterprise.

510.    Zapolsky, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Approach enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Approach was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Approach in contravention of New York law, and in many cases were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "17."  Each such mailing was made in furtherance of the mail fraud scheme.

511.    Zapolsky, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

512.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $380,593.00 pursuant to the fraudulent bills submitted by the Defendants through Approach.

513. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**THIRTIETH CAUSE OF ACTION**
**Against Kulagina, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

</div>

514. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 513 above.

515. SML Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

516. Kulagina, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of SML's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over two years seeking payments that SML was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control SML in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "18."

517.    SML's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Kulagina, Sylvan, Osipov and Anikeyev operate SML, insofar as SML never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for SML to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through SML to the present day.

518.    SML is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. SML likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by SML in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

519.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $134,279.00 pursuant to the fraudulent bills submitted by the Defendants through SML since May 11, 2009.

520.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTY-FIRST CAUSE OF ACTION
### Against Kulagina, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(d))

521.  GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 520 above.

522.  SML Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

523.  Kulagina, Sylvan, Osipov and Anikeyev are employed by and/or associated with the SML enterprise.

524.  Kulagina, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the SML enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that SML was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control SML in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "18." Each such mailing was made in furtherance of the mail fraud scheme.

525.    Kulagina, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

526.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $134,279.00 pursuant to the fraudulent bills submitted by the Defendants through SML.

527.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-SECOND CAUSE OF ACTION
### Against Shimulov, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

528.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 527 above.

529.    Bronx Acupuncture Therapy, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

530.    Shimunov, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Bronx Therapy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for more than one year seeking payments that Bronx Therapy was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary,

were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Bronx Therapy in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "19."

531. Bronx Therapy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Shimunov, Sylvan, Osipov and Anikeyev operate Bronx Therapy, insofar as Bronx Therapy never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Bronx Therapy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Bronx Therapy to the present day.

532. Bronx Therapy is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Bronx Therapy likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bronx Therapy in

pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

533. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $290,090.00 pursuant to the fraudulent bills submitted by the Defendants through Bronx Therapy since December 4, 2009.

534. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTY-THIRD CAUSE OF ACTION
#### Against Shimunov, Sylvan, Osipov and Anikeyev
#### (Violation of RICO, 18 U.S.C. § 1962(d))

535. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 534 above.

536. Bronx Acupuncture Therapy, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

537. Shimunov, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Bronx Therapy enterprise.

538. Shimunov, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Bronx Therapy enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Bronx Therapy was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-

140

splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Bronx Therapy in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "19." Each such mailing was made in furtherance of the mail fraud scheme.

539.    Shimunov, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

540.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $290,090.00 pursuant to the fraudulent bills submitted by the Defendants through Bronx Therapy.

541.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-FOURTH CAUSE OF ACTION
### Against Shkapenyuk, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

542.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 541 above.

543.    TC Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

141

544.     Shkapenyuk, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of TC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over one year seeking payments that TC was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control TC in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "20."

545.     TC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Shkapenyuk, Sylvan, Osipov and Anikeyev operate TC, insofar as TC never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for TC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through TC to the present day.

546.     TC is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. TC likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by TC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

547.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $136,463.00 pursuant to the fraudulent bills submitted by the Defendants through TC since June 24, 2010.

548.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-FIFTH CAUSE OF ACTION
### Against Shkapenyuk, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(d))

549.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 548 above.

550.     TC Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

551.     Shkapenyuk, Sylvan, Osipov and Anikeyev are employed by and/or associated with the TC enterprise.

552.    Shkapenyuk, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the TC enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that TC was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control TC in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "20." Each such mailing was made in furtherance of the mail fraud scheme.

553.    Shkapenyuk, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

554.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $136,463.00 pursuant to the fraudulent bills submitted by the Defendants through TC.

555.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-SIXTH CAUSE OF ACTION
### Against Kornilova, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

556.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 555 above.

557.    Acuhealth Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

558.    Kornilova, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Acuhealth's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for two years seeking payments that Acuhealth was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Acuhealth in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "21."

145

559. Acuhealth's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kornilova, Sylvan, Osipov and Anikeyev operate Acuhealth, insofar as Acuhealth never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Acuhealth to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Acuhealth to the present day.

560. Acuhealth is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Acuhealth likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Acuhealth in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

561. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $152,912.00 pursuant to the fraudulent bills submitted by the Defendants through Acuhealth since June 24, 2010.

562. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTY-SEVENTH CAUSE OF ACTION
### Against Kornilova, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(d))

563.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 562 above.

564.    Acuhealth Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

565.    Kornilova, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Acuhealth enterprise.

566.    Kornilova, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Acuhealth enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Acuhealth was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Acuhealth in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "21." Each such mailing was made in furtherance of the mail fraud scheme.

567. Kornilova, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

568. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $152,912.00 pursuant to the fraudulent bills submitted by the Defendants through Acuhealth.

569. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTY-EIGHTH CAUSE OF ACTION
### Against Razzakova, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

570. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 569 above.

571. NR Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

572. Razzakova, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of NR's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over nine years seeking payments that NR was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed

148

and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control NR in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "22."

573.    NR's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Razzakova, Sylvan, Osipov and Anikeyev operate NR, insofar as NR never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for NR to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through NR to the present day.

574.    NR is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. NR likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NR in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

575.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,132.00 pursuant to the fraudulent bills submitted by the Defendants through NR since October 24, 2010.

576.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**THIRTY-NINTH CAUSE OF ACTION**
**Against Razzakova, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

</div>

577.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 576 above.

578.    NR Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

579.    Razzakova, Sylvan, Osipov and Anikeyev are employed by and/or associated with the NR enterprise.

580.    Razzakova, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the NR enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that NR was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to

enrich the unlicensed individuals and entities that own and control NR in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "22." Each such mailing was made in furtherance of the mail fraud scheme.

581.    Razzakova, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

582.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,132.00 pursuant to the fraudulent bills submitted by the Defendants through NR.

583.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FORTIETH CAUSE OF ACTION
### Against Tsukanov, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

584.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 583 above.

585.    Silver Lotus Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

586.    Tsukanov, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of Silver Lotus' affairs through a pattern of

racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over six months seeking payments that Silver Lotus was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Silver Lotus in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "23."

587.    Silver Lotus' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Tsukanov, Sylvan, Osipov and Anikeyev operate Silver Lotus, insofar as Silver Lotus never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Silver Lotus to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Silver Lotus to the present day.

588.    Silver Lotus is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing

152

misrepresentations made to the New York State Department of Education and the New York State Department of State. Silver Lotus likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Silver Lotus in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

589. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $33,631.00 pursuant to the fraudulent bills submitted by the Defendants through Silver Lotus since December 2, 2010.

590. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**FORTY-FIRST CAUSE OF ACTION**
**Against Tsukanov, Sylvan, Osipov and Anikeyev**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

</div>

591. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 590 above.

592. Silver Lotus Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

593. Tsukanov, Sylvan, Osipov and Anikeyev are employed by and/or associated with the Silver Lotus enterprise.

594. Tsukanov, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Silver Lotus enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of

the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Silver Lotus was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control Silver Lotus in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "23." Each such mailing was made in furtherance of the mail fraud scheme.

595. Tsukanov, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

596. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $33,631.00 pursuant to the fraudulent bills submitted by the Defendants through Silver Lotus.

597. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTY-SECOND CAUSE OF ACTION
### Against Kondranina, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(c))

598. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 597 above.

599. New Century Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

600. Kondranina, Sylvan, Osipov and Anikeyev knowingly have conducted and/or participated, directly or indirectly, in the conduct of New Century's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over six months seeking payments that New Century was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; and (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control New Century in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "24."

601. New Century's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kondranina, Sylvan, Osipov and Anikeyev operate New Century,

insofar as New Century never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for New Century to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through New Century to the present day.

602.   New Century is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by non-acupuncturists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. New Century likewise is engaged in inherently unlawful acts inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by New Century in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

603.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $31,079.00 pursuant to the fraudulent bills submitted by the Defendants through New Century since December 9, 2010.

604.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FORTY-THIRD CAUSE OF ACTION
### Against Kondranina, Sylvan, Osipov and Anikeyev
### (Violation of RICO, 18 U.S.C. § 1962(d))

605.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 604 above.

606.    New Century Acupuncture, PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

607.    Kondranina, Sylvan, Osipov and Anikeyev are employed by and/or associated with the New Century enterprise.

608.    Kondranina, Sylvan, Osipov and Anikeyev knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the New Century enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that New Century was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-acupuncturists; (ii) it engaged in fee-splitting with non-acupuncturists; (iii) the billed-for services were not medically necessary, were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the unlicensed individuals and entities that own and control New Century in contravention of New York law, and in many cases were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "24." Each such mailing was made in furtherance of the mail fraud scheme.

157

609.     Kondranina, Sylvan, Osipov and Anikeyev knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

610.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $31,079.00 pursuant to the fraudulent bills submitted by the Defendants through New Century.

611.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FORTY-FOURTH CAUSE OF ACTION
#### Against all Defendants
#### (Violation of RICO, 18 U.S.C. § 1962(c))

612.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 611 above.

613.     Okslen, Bay Needle, Perfect Point, Karina K, Healthy Way, VS, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, New Century, Razzakova, Kulagina, Kapustina, Tsuakov, Kolomiytseva, Shimunov, Kornilova, Lendel, Zapolsky, Abitbol, Kondranina, Shkapenyuk, Sylvan, Anikeyev and Osipov ("the Sylvan Fraudulent Acupuncture Enterprise") constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

614.     The members of the Sylvan Fraudulent Acupuncture Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and

consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose.

615.    Specifically, Razzakova, Kulagina, Kapustina, Tsuakov, Kolomiytseva, Shimunov, Kornilova, Lendel, Zapolsky, Abitbol, Kondranina, Shkapenyuk are acupuncturists who incorporated Okslen, Bay Needle, Perfect Point, Karina K, Healthy Way, VS, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus and New Century, who purport to act as the shareholders, directors and officers of the professional corporations and oversee the professional corporations' operations on a day-to-day basis, and who purport to perform or oversee many of the fraudulent acupuncture services and issue reports.

616.    Okslen, Bay Needle, Perfect Point, Karina K, Healthy Way, VS, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, and New Century ostensibly are independent entities – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO. The Sylvan Fraudulent Acupuncture Enterprise has been operated under twenty separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company.

617.    Razzakova, Kulagina, Kapustina, Tsuakov, Kolomiytseva, Shimunov, Kornilova, Lendel, Zapolsky, Abitbol, Kondranina, Shkapenyuk purport to be employees of Okslen, Bay Needle, Perfect Point, Karina K, Healthy Way, VS, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, and New

Century; purport to perform or oversee acupuncture services; and issue false reports relating to the acupuncture services to support the fraudulent charges in order to permit Okslen, Bay Needle, Perfect Point, Karina K, Healthy Way, VS, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, and New Century to bill for and collect No-Fault Benefits to which they are not entitled. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Sylvan Fraudulent Acupuncture Enterprise acting singly or without the aid of each other.

618.   The Sylvan Fraudulent Acupuncture Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records resulting from the performance of the fraudulent acupuncture services, by recruiting and supervising personnel, by negotiating and executing various billing and collection agreements, facility lease agreements, equipment lease agreements and management agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

619.   Okslen, Bay Needle, Perfect Point, Karina K, Healthy Way, VS, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, New Century Razzakova, Kulagina, Kapustina, Tsuakov, Kolomiytseva, Shimunov, Kornilova, Lendel, Zapolsky, Abitbol, Kondranina, Shkapenyuk, Sylvan, Anikeyev

and Osipov each was employed by and/or associated with the Sylvan Fraudulent Acupuncture Enterprise.

620. Okslen, Bay Needle, Perfect Point, Karina K, Healthy Way, VS, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, New Century Razzakova, Kulagina, Kapustina, Tsuakov, Kolomiytseva, Shimunov, Kornilova, Lendel, Zapolsky, Abitbol, Kondranina, Shkapenyuk, Sylvan, Anikeyev and Osipov knowingly conducted and/or participated, directly and/or indirectly, in the conduct of the Sylvan Fraudulent Acupuncture Enterprise through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis over more than six (6) years. Furthermore, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Sylvan Fraudulent Acupuncture Enterprise continues to submit and attempt collection on fraudulent billing to the present day. A representative sample of the acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibits "5" - "24."

621. Each of these predicate acts of mail fraud constituted an inherently unlawful act committed at the behest of the Sylvan Fraudulent Acupuncture Enterprise, an organization whose business is racketeering activity. These predicate acts of mail fraud were the regular way in which the Defendants operated the Sylvan Fraudulent Acupuncture Enterprise, inasmuch as Okslen, Bay Needle, Perfect Point, Karina K, Healthy Way, VS, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, and New Century were never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Sylvan Fraudulent Acupuncture Enterprise to

function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

622. The Defendants continue to attempt collection on the fraudulent billing.

623. GEICO has been injured in its business and property by reason of the above conduct in that it has paid more than $8,519,292.00 Dollars pursuant to the fraudulent bills submitted through Okslen, Bay Needle, Perfect Point, Karina K, Healthy Way, VS, Alpha, Lotus, Sunrise, Easy Care, Shirom, Urban Well, Approach, SML, Bronx Therapy, TC, Acuhealth, NR, Silver Lotus, and New Century.

624. By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorney's fees pursuant to 18 U.S.C. Section 1964(c), and any other relief the Court deems just and proper.

## JURY DEMAND

625. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor and against the Defendants, as follows:

A. On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B. On the Second Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $8,519,292.00 , together

162

with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  C.  On the Third Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $8,519,292.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  D.  On the Fourth Cause of Action against Lendel, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $891,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  E.  On the Fifth of Action against Lendel, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $891,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  F.  On the Sixth Cause of Action against Matskina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $279,896.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  G.  On the Seventh Cause of Action against Matskina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $279,896.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.     On the Eighth Cause of Action against Kapustina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $348,542.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.     On the Ninth Cause of Action against Kapustina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $348,542.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.     On the Tenth Cause of Action against Kolomiytseva, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $681,471.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.     On the Eleventh Cause of Action against Kolomiytseva, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $681,471.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.     On the Twelfth Cause of Action against Matskina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,086,027.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.     On the Thirteenth Cause of Action against Matskina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in

excess of $1,086,027.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.    On the Fourteenth Cause of Action against Lendel, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $708,937.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.    On the Fifteenth Cause of Action against Lendel, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $708,937.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.    On the Sixteenth Cause of Action against Kolomiytseva, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $204,713.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Q.    On the Seventeenth Cause of Action against Kolomiytseva, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $204,713.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.    On the Eighteenth Cause of Action against Kornilova, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,022,413.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.     On the Nineteenth Cause of Action against Kornilova, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,022,413.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.     On the Twentieth Cause of Action against Tsukanov, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $770,785.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.     On the Twenty-First Cause of Action against Tsukanov, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $770,785.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.     On the Twenty-Second Cause of Action against Kulagina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $644,998.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.     On the Twenty-Third Cause of Action against Kulagina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $644,998.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.     On the Twenty-Fourth Cause of Action against Shimunov, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in

excess of \$365,691.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Y. On the Twenty-Fifth Cause of Action against Shimunov, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of \$365,691.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Z. On the Twenty-Sixth Cause of Action against Abitbol, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of \$350,228.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA. On the Twenty-Seventh Cause of Action against Abitbol, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of \$350,228.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB. On the Twenty-Eighth Cause of Action against Zapolsky, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of \$380,593.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC. On the Twenty-Ninth Cause of Action against Zapolsky, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of \$380,593.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

DD.     On the Thirtieth Cause of Action against Kulagina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $134,279.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

EE.     On the Thirty-First Cause of Action against Kulagina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $134,279.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

FF.     On the Thirty-Second Cause of Action against Shimunov, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $290,090.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.     On the Thirty-Third Cause of Action against Shimunov, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $290,090.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

HH.     On the Thirty-Fourth Cause of Action against Shkapenyuk, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $136,463.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

II.     On the Thirty-Fifth Cause of Action against Shkapenyuk, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in

excess of $136,463.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

JJ.     On the Thirty-Sixth Cause of Action against Kornilova, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $152,912.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

KK.     On the Thirty-Seventh of Action against Kornilova, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $152,912.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

LL.     On the Thirty-Eighth Cause of Action against Razzakova, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $5,132.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

MM.     On the Thirty-Seventh of Action against Razzakova, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $5,132.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

NN.     On the Fortieth Cause of Action against Tsukanov, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $33,631.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

OO.    On the Forty-First Cause of Action against Tsukanov, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $33,631.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

PP.    On the Forty-Second Cause of Action against Kondranina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $31,079.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

QQ.    On the Forty-Third Cause of Action against Kondranina, Sylvan, Osipov and Anikeyev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $31,079.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

RR.    On the Forty-Fourth Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $8,519,292.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: July 1, 2011
       Uniondale, New York

RIVKIN RADLER LLP

By: _____
    Michael A. Sirignano (MS 5263)
    Barry I. Levy (BL 2190)
    Ryan Goldberg (RG 7570)
    Tamika N. Hardy (TH 0569)

170

926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
RR File No.: 005100-00043

*Counsel for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*

2491325 v14

171

# EXHIBIT 1